824 P.2d 349 (1991)
113 N.M. 309
STATE of New Mexico ex rel. Cleo HUGHES, Plaintiff-Appellant,
v.
CITY OF ALBUQUERQUE, Gene Romo, Chief Administrative Officer, City of Albuquerque Personnel Board, Defendants-Appellees.
No. 11624.
Court of Appeals of New Mexico.
December 3, 1991.
*350 James T. Roach, Janet Santillanes, Albuquerque, for plaintiff-appellant.
David S. Campbell, City Atty., Paula I. Forney, Asst. City Atty., Albuquerque, for defendants-appellees.

OPINION
HARTZ, Judge.
Cleo F. Hughes appeals from a judgment of the district court that affirmed the decision of the personnel board of the City of Albuquerque to uphold his termination from city employment "for gross and negligent supervising actions * * * directed at [his] subordinate." Hughes contends: (1) the termination procedure violated his right to due process and the city merit ordinance; (2) the board erred in refusing to hear evidence regarding a polygraph examination; and (3) the board did not make proper findings of fact and the findings do not support the board's conclusion that he should be terminated. We reject Hughes' first two contentions but agree that the board's findings and conclusions are sufficiently ambiguous that remand is required for amended findings and conclusions.

I. BACKGROUND
In August 1985 a female city employee (hereinafter the "complainant") submitted to the City a formal written complaint accusing Hughes of sexual harassment. Hughes was placed on administrative leave with pay while a committee appointed by the chief administrative officer of the City, Bob Stover, investigated the allegations. Hughes received notice of the allegations and was represented by counsel during the investigation. He personally testified and recommended witnesses who were interviewed. On October 3 the committee submitted a report sustaining the allegations against Hughes and gave him notice of a pre-termination hearing to be held on October 17. At the hearing Hughes and his counsel were given the opportunity again to refute or deny the allegations or justify his actions. On October 22 Stover and Carl P. Rodolph, Hughes' department director, co-signed a letter to Hughes terminating his employment as of the end of that workday. Hughes appealed his termination to the city personnel board. After hearing approximately fifteen hours of testimony and argument, the board upheld the termination by a three-to-one vote. Hughes obtained review in the district court on a petition for certiorari. The district court affirmed the board's decision.

II. DENIAL OF DUE PROCESS; VIOLATION OF GRIEVANCE PROCEDURES
Citing Lovato v. City of Albuquerque, 106 N.M. 287, 742 P.2d 499 (1987), Hughes contends that a city employee's due process rights are violated if the procedures set forth in the city merit ordinance are not followed. We do not read Lovato to stand for that proposition. On the contrary, we have recently ruled that violation of a state law requiring specific procedures does not necessarily constitute a violation of constitutional due process. Garcia v. Las Vegas *351 Medical Ctr., 112 N.M. 441, 816 P.2d 510 (Ct.App. 1991); see also Jacobs v. Meister, 108 N.M. 488, 493-95, 775 P.2d 254, 259-61 (Ct.App. 1989) (questioning whether nontenured professor had due process right to the procedures set forth in the faculty handbook). Nevertheless, Hughes may be entitled to relief if the procedures mandated by city ordinance were not followed, see Conwell v. City of Albuquerque, 97 N.M. 136, 637 P.2d 567 (1981), or if his right to due process was violated in the course of the proceedings against him. See Lovato v. City of Albuquerque. We therefore address Hughes' specific claims of procedural error.
The parties agree that the governing procedures are those relating to Class I grievances. Class I grievances are defined by city ordinance as "Management actions questioned by the employee which result in the dismissal, demotion or suspension of the employee for more than five (5) working days[.]" City of Albuquerque, City Merit Ordinance § 2-9-25(C). The pertinent portion of the grievance procedure states:
D. Class I grievances are subject to the following Grievance Resolution Procedures:
1. When an employee believes he or she has been aggrieved by a management action which results in dismissal, demotion or suspension of the employee for more than five (5) working days, he or she shall first discuss the action with his or her immediate supervisor and then his or her department head, if necessary, with the objective of resolving the matter informally. If a satisfactory solution to the problem cannot be obtained at this level, the aggrieved employee shall make a formal written complaint of his or her grievance to the Chief Administrative Officer with a copy to his or her department head within ten (10) calendar days of the occurrence of the grievable action. Such complaint shall identify the action questioned and the reasons why the action should not have been taken.
2. Within ten (10) calendar days of the receipt of the employee's written grievance, the Chief Administrative Officer, or his designated representative, after consultation with the department head, shall render his or her decision and shall also provide written notice of his or her decision to the aggrieved employee. If the employee is unsatisfied with the decision of the Chief Administrative Officer, he or she may, within ten (10) calendar days of receipt of such notice, request that the Personnel Board provide him or her a full hearing on the matter.
§ 2-9-25(D).
The ordinance provisions for Class I grievances do not apply to pretermination proceedings. The procedures described in the ordinance concern a grievance by an employee who has already been dismissed or suspended. Therefore, to the extent that Hughes argues that mandatory grievance procedures were not followed prior to his termination, we reject his argument.
Hughes appears to argue also, however, that the manner in which his termination was handled deprived him of the procedural rights set forth above. He does not contend that after his termination he was refused the opportunity to discuss the action with his immediate supervisor or department head or was refused permission to make a formal written complaint to Chief Administrative Officer Stover. As we understand his briefs on appeal, he is contending that the manner of his termination  in particular, the fact that the termination was effected by a letter written by Stover and department director Rodolph  deprived him of the opportunity to have his contentions reviewed under the grievance procedure by a neutral person. He claims that Stover, as chief administrative officer, should have remained out of the decision-making process until Hughes filed a formal complaint under the grievance procedure.
We disagree that either the ordinance or the requirements of due process support Hughes' contention. We note that the Class I grievance procedure necessarily requires at least some reconsideration by a person who has already made a decision adverse to the employee. The first person *352 with whom the employee is to discuss the adverse action is the employee's immediate supervisor. Yet the immediate supervisor is the person most likely to have taken, or at least recommended, the adverse action. The next most likely person to have taken or recommended the adverse action is the department head. Yet the second stage in the grievance procedure is discussion by the employee with the department head.
We recognize that the City's chief administrative officer is unlikely to become personally involved in most decisions to terminate employees, but nothing in the City's grievance procedure suggests that the chief administrative officer is deprived of the authority to become involved in such decisions when such involvement appears advisable. When, as in this case, the controversy is one of great sensitivity, the chief administrative officer may well consider it a duty to be sure that the decision is correct before it is made. Perhaps Hughes had good reason to believe that he would obtain no satisfaction by pursuing the grievance procedure through the level of the chief administrative officer; after all, Stover had already reviewed the extensive investigation conducted prior to termination. But we are not inclined to interpret the grievance procedure ordinance to prohibit the City from providing an employee with a thorough review of a complaint against him at the highest levels of city government before taking adverse action against the employee.
Reinforcing our view of the ordinance is the provision in the ordinance for formal review by the city personnel board. The availability of board review ensures that every employee can obtain review of the facts by persons who had no involvement in the decision to terminate and renders it unnecessary that the chief administrative officer act as a neutral arbiter.
In short, we find no violation of the city ordinance in the proceedings relating to Hughes. Moreover, the extensive pretermination proceedings and the formal proceedings before the board after termination provided Hughes with all the procedural due process to which he was entitled. See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985).

III. POLYGRAPH EXAM
At the hearing before the personnel board, Hughes contended that one basis for his termination was a polygraph examination taken by the complainant. To show that the examination should not have been used by the City in deciding to terminate him, he sought to introduce evidence that the results of the examination were misinterpreted and did not support the reliability of the accusations against him. The board refused to hear the evidence because the City had not offered the polygraph examination results in the board hearing. We find no error in this evidentiary ruling.
The polygraph examination results were not a separate ground for the termination of Hughes. The ground for his termination was the conduct about which the complainant testified. Both the city administrators and the board needed to determine whether the complainant was telling the truth. But the basis upon which the administrators determined her veracity was not material to the board. The polygraph examination in this case served the same role as a witness testifying to the complainant's character for veracity. Even if the City considered the statement of such a character witness in deciding whether to terminate an employee, the City would not therefore have to establish the reliability of the character witness at the board hearing if the character witness was not offered as a witness at the hearing. The reliability of the polygraph examination was not material to the board hearing, and the board properly refused to hear evidence on the matter.

IV. FINDINGS AND CONCLUSIONS
If the personnel board believed the complainant, it had ample cause to determine that Hughes committed sexual harassment justifying his termination. Hughes contends, however, that (1) the findings by the board do not establish that the board believed the allegations of *353 harassment and (2) the facts actually found by the board are insufficient to justify his termination.
Hughes points to certain findings by the board which relate what the complainant said, rather than what the board found to be true. These findings are included within finding No. 10, which reads:
On August 15, 1985, [Hughes] again took [complainant] to Santa Fe for the ostensible purpose of correcting a mailing list. On that day, the following took place:
[a] [Hughes], with [complainant], left the city office between 9:30 and 10:00 a.m. and had breakfast at Four B's Restaurant.
[b] [Hughes] went to his home, with [complainant], for the stated purpose of getting another wristwatch.
[c] [Hughes] invited [complainant] into his home because he was going to use the telephone.
[d] [Complainant] stated that [Hughes] approached her while she was near the couch and placed his arms around her. He put his hands on her cheeks and kissed her with his tongue.
[e] [Hughes] was told to stop by [complainant].
[f] [Hughes] reportedly said, "Don't we have a chance," standing in the entryway of his home.
[g] [Hughes] and [complainant] left [Hughes'] home and stopped at a nearby Safeway store to purchase two packages of gum.
[h] Enroute to Glorieta, [Hughes] told [complainant] that he originally planned to take a nap at his home, go to lunch, and take another nap. [Complainant] interpreted this as a proposition.
[i] After stopping in Glorieta, [Hughes] and [complainant] drove to Santa Fe for an appointment to Construction Industries, a state agency.
[j] [Hughes] met with David Steel, New Mexico Director of Construction Industries. [Complainant] sat in the office of Bernetta Hules, administrative supervisor to David Steele.
[k] After leaving Construction Industries, [Hughes] purchased Kentucky Fried Chicken for their lunch. Lunch was eaten enroute to Albuquerque.
[l] [Hughes] exited I-25 for a rest area where garbage was thrown out.
[m] [Complainant] said, [Hughes] told her he didn't want to have sexual intercourse with her because he didn't want to get her pregnant. He would leave that to [her] gentleman friend. [Hughes] asked [complainant] to give an old man a "blow job."
[n] [Hughes] reportedly offered money to [complainant] for her son, if she ever needed it.
[o] [Hughes] and [complainant] stopped at an auto shop in Albuquerque to have the front seat of [Hughes'] car adjusted.
[p] After arriving in downtown Albuquerque, [Hughes] dropped [complainant] at the Federal Building and proceeded to his office. Once there [complainant's] mother, called to tell [complainant] that her aunt would not be able to pick her up at the Federal Building. [Hughes] went to the Federal Building to deliver the message to [complainant]. Subsequently, [Hughes] drove [complainant] to the First National Bank to meet her mother.
Hughes relies on Mosley v. Magnolia Petroleum Co., 45 N.M. 230, 240, 114 P.2d 740, 747 (1941), which "cancelled" a finding by the district court "because it is not a finding of fact, but a statement regarding the testimony of witnesses." He contends that we must likewise cancel the portions of the above finding (subparagraphs [d], [f], [m], and [n]) that merely recite the testimony.
The City distinguishes Mosley on the ground that it involved a district court. In this case, the City argues, we are dealing with a personnel board composed of lay people who cannot be expected to comply with the same drafting standards as district courts. We sympathize with the general proposition stated by the City. We should not overburden administrative agencies *354 with technical requirements. On the other hand, the matter before the board was one of great importance.
Balancing these considerations, we neither adopt the per se rule suggested by Mosley, nor do we indulge a presumption that the board believed the statements by the complainant set forth in its findings. Rather, we examine the board's decision as a whole to see if we can determine what the board actually found.
Some language in finding No. 10 suggests that the board believed the complainant's statements. For example, the finding states "On that day, the following took place:" and subparagraph [e] seems to assume the truth of the statement in subparagraph [d]. On the other hand, the bulk of the entries in the finding are simple declarations of fact, with no reference to anyone reporting or stating the fact. We find it significant that it is the findings relating to the core allegations, which were hotly disputed, that are qualified by words such as "reportedly" or "[complainant] stated."
Our concern is heightened by the conclusions stated by the board. The conclusions were:
1. Sexual harassment as used in the city administrative instruction is defined as "unwelcomed sexual advance, request for sexual favors, and other verbal or physical conduct of a sexual nature." (See Administrative Instruction # 44, Dated November 1, 1983).
2. With two female trainees, [Hughes] acted in a manner which was interpreted by the women as sexual harassment.
3. After engaging in conduct interpreted as sexual harassment by the first complaining female, [Hughes] was warned that his future conduct must preclude any behavior which could be interpreted as sexual harassment.
4. Subsequently to this warning, [Hughes] again engaged in behavior construed as sexual harassment.
5. This conduct is inappropriate for a city employee.
ACCORDINGLY, The Personnel Board of the City of Albuquerque upholds the termination of Mr. Cleo Hughes for gross and negligent supervising actions directed at his subordinate.
Rather than stating that Hughes committed sexual harassment, the board concluded that he "engaged in behavior construed as sexual harassment" by the complainant and an earlier alleged victim. Although that choice of words may be understandable in light of the fact that Hughes had been warned by his superiors to avoid behavior that could be interpreted as sexual harassment, the phrasing nonetheless raises a question as to whether the board found that the most egregious of the alleged conduct actually occurred. If the board had so found, one would expect the conclusion to recite explicitly that Hughes committed sexual harassment.
Thus, the record does not enable us to affirm Hughes' termination on the ground that the board believed the statements by the complainant set forth in the board's findings.
The City contends, however, that the board can be affirmed even if we disregard the findings challenged by Hughes, because the remaining findings suffice to support the board's conclusions. The problem with this argument is that the conclusions do not suffice to justify termination.
As already noted, the board's conclusions do not state that Hughes committed sexual harassment. The conclusions state only that the alleged victims construed Hughes' actions as sexual harassment. The City argues that this conclusion "falls within the definition of sexual harassment set out by the Board[.]" We disagree. The City relies on Administrative Instruction No. 44, which defines sexual harassment as "unwelcomed sexual advance, request for sexual favors, and other verbal or physical conduct of a sexual nature." Although the perception of the victim is a factor in determining whether conduct satisfies the definition, that perception must be reasonable. See Ellison v. Brady, 924 F.2d 872 (9th Cir.1991) (applying "reasonable woman" standard to claim of sexual harassment *355 under Civil Rights Act of 1964); cf. Green v. City of Albuquerque, 112 N.M. 784, 819 P.2d 1342 (Ct.App. 1991) (employee is not entitled to benefits under Workers' Compensation Act for disability caused by perceived harassment). The board's conclusion does not justify Hughes' termination because it does not include the necessary language that the complainant's perception was reasonable. The reasonableness of the perception does not follow from the unchallenged findings as a matter of law; and because of our uncertainty as to which allegations the board believed, we are reluctant to presume that the board concluded that the complainant's perception of harassment was reasonable.
The City also appears to argue that we can sustain Hughes' dismissal on the ground that he failed to comply with warnings concerning his behavior. Conclusions 3 and 4 suggest that the board may have ruled against Hughes for violating a directive not to engage in conduct that could be perceived as sexual harassment. The propriety of such a ruling would depend, however, upon whether the board found that Hughes had been given simply a general warning to refrain from behavior that could be construed as sexual harassment or whether he was warned against engaging in certain specified conduct that could be so construed. Failure to comply with a specific directive might be proper grounds for discipline, even termination. On the other hand, a general directive not to engage in conduct that could be construed as sexual harassment might not provide adequate notice to refrain from particular conduct. Cf. Chavez v. Employment Sec. Comm'n, 98 N.M. 462, 649 P.2d 1375 (1982) (for purposes of Unemployment Compensation Law, discharge was not for misconduct because alleged misconduct was not preceded by adequate warnings). To illustrate this point, we consider the possibilities in the case before us. Shortly before the incident involving complainant, Hughes had been accused of similar conduct. To avoid the future occurrence or appearance of sexual harassment, the City might have instructed Hughes not to engage in certain particular conduct that could be perceived as sexual harassment, such as inviting a female subordinate into his home during working hours or taking a female subordinate on a business trip when her presence serves no evident business purpose. The board might then have sustained Hughes' termination if it found that Hughes had violated such a directive and that the directive was reasonable.[1] If, however, the board found that he was simply told in general terms to refrain from any conduct that might be construed as sexual harassment, the board could not sustain Hughes' termination unless it also found that he engaged in conduct that was reasonably construed as sexual harassment. Hence, we cannot affirm the board on the ground that Hughes violated a directive because on this record we cannot tell whether the board found that Hughes violated only a general directive or violated a specific directive prohibiting particular conduct.
Moreover, it is unclear whether the board referred to Hughes' failure to heed the warning as an independent basis for termination or as a justification for imposing that sanction on one who has violated Administrative Instruction No. 44. If the latter, the board's ruling stands or falls on whether it applied a correct understanding of Instruction No. 44 to the facts it found, a matter concerning which we have already expressed our uncertainty. Thus, Conclusions 3 and 4 are insufficient to sustain the board's ruling.
Therefore, we reverse the district court's judgment and remand to the district court with directions to remand to the personnel board for further proceedings consistent with this opinion. If it is possible to reconstitute the board (or at least the three-member majority) that originally heard this matter, the further proceedings before the board need be only revision of the board's findings and conclusions to clarify what allegations it believes and the basis on *356 which it affirms or reverses Hughes' termination.
IT IS SO ORDERED.
MINZNER and FLORES, JJ., concur.
NOTES
[1] Without knowing what specific facts were found by the board, we cannot decide whether termination on such ground would be proper in this case.