[No. F027340. Fifth Dist. Jan. 24, 2000.]

RICHARD A. RUIZ et al., Plaintiffs and Appellants, v.
DEPARTMENT OF CORRECTIONS, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II through IV.

**COUNSEL**

Alcala & Velez, Carlos M. Alcala and Raymond A. Mills for Plaintiffs and Appellants.

Lozano, Smith, Smith, Woliver & Behrens, Peter K. Fagen and Eileen M. O'Hare for Defendant and Appellant.

## OPINION

**LEVY, J.—**

### BACKGROUND OF THE ACTION

Richard A. Ruiz and his wife, Frances Gantong-Ruiz (hereinafter Ruiz and Gantong, respectively), were employed by the California Department of Corrections (Department). They filed suit against the Department and the Central California Women's Facility (CCWF) for discrimination and harassment. The trial court entered a judgment on the pleadings against Ruiz for failing to exhaust his administrative remedies and a judgment for nonsuit against Gantong for failing to produce evidence of discrimination. The court also ordered plaintiffs to pay attorney fees and costs. In the published portion of this opinion, we will conclude Ruiz did exhaust his administrative remedies, and, accordingly, will reverse the judgment on the pleadings. In the unpublished portion of this opinion we shall reverse the judgment against Gantong, finding she did present sufficient evidence of discrimination to survive a motion for nonsuit. We shall also reverse the order for attorney fees and costs. Finally, we will affirm the trial court's denial of the Department's motion for summary judgment, an issue raised in a cross-appeal filed by the Department in the event we reversed any portion of the judgment.

### FACTUAL AND PROCEDURAL HISTORY

Ruiz and Gantong were employed by the Department and were assigned to the CCWF. Ruiz worked as a prison guard; Gantong worked in the investigative services unit (ISU) as an investigator and evidence officer. She went by the name Gantong so the inmates would not know she was married to one of the guards.

Gantong developed a reputation as an excellent investigator, uncovering numerous drug connections from outside visitors. She was named "employee of the month" in February 1994, a distinction that was mentioned in a staff newsletter with her approval. However, she later contended the publication jeopardized her security because it contained personal information that could be viewed by inmates who worked the printing press.

Sometime after the article appeared the ISU learned it would receive a drug-detecting canine. There was a delay and the dog did not arrive. Because Gantong was so successful in detecting and intercepting drugs, there developed a running joke that Gantong was the drug-detecting canine. Cagie Brown, the head of the ISU, took a picture of a canine out of her training

manual and placed a copy of Gantong's face over the dog's face. Gantong never objected to the picture and kept a copy of it in her office for weeks. Brown testified the joke was meant as a tribute to Gantong's ability to find drugs and that Gantong had interpreted it as such. However, Gantong testified she felt uncomfortable with the joke and was insulted by it. Shortly thereafter, Gantong, Brown, and Rick Allen, another member of the ISU, planned a future trip to Lake Tahoe with others.

Over three months later, in May 1994, certain inmates alleged Ruiz had engaged in sexual misconduct with another inmate. The watch commander interviewed the inmate in question and learned Ruiz had isolated and then coerced her to engage in certain sex acts. The commander turned the investigation over to Allen and Brown, who later discovered two other inmates had also experienced similar encounters with Ruiz. Brown and Allen spoke with Gantong about the investigation and explained they had a job to do; Gantong responded she understood. Brown withdrew from the Lake Tahoe trip, telling Gantong the integrity of the investigation would be impaired otherwise. On another occasion, Brown told Gantong in the presence of another that she could not socialize with her and that she was planning on transferring Gantong out of the ISU. Gantong later testified Brown told her she felt as if she held the fate of Gantong's family in the palm of her hand; Brown denied making that statement. Gantong expressed resentment that their relationship was changing and did not want to be treated any differently than before the allegations were made. Although Gantong remained in the ISU and did some investigative work, Brown assigned her to other duties as well because she feared Gantong might retaliate against the inmates for their allegations against her husband. Those duties, however, were within the scope of Gantong's employment responsibilities.

Gantong went on medical stress leave for three weeks in July 1994. Precipitating this decision was an order given by Brown that she clean out the evidence locker, which, in Gantong's view, was indicative of the degrading treatment she had received since the allegations against her husband surfaced. Gantong later acknowledged on cross-examination that it was her duty as evidence officer to clean out the locker on occasion. However, she testified Brown had placed an increasing emphasis on assigning her menial duties once the allegations surfaced. She also said Brown's overall demeanor and attitude toward her had become increasingly aloof, abrupt, and withdrawn. She said the atmosphere of the office had changed and that Brown would speak to her only when necessary.

Brown testified she did feel uncomfortable with Gantong in the unit and was simply making the best of an awkward situation. In an effort to be

professional and objective, Brown admitted she became somewhat distant and did minimize any socializing with Gantong. She testified she asked Gantong to transfer out of the unit because, in her view, it was the appropriate action to take. However, she left that decision to Gantong. On cross-examination, Brown testified her behavior would have been the same had the investigation involved Gantong's brother or father.

Upon Gantong's return from stress leave, Brown asked her to turn in her key to Brown's office. She did so because she did not consider it appropriate that Gantong have access to her office, which contained physical evidence of the Ruiz investigation. Gantong transferred out of the ISU the following day and continued her employment at CCWF in another department until September 1994. At that time her doctor placed her on sick leave; she was not released to return to work until August 1996. She did not return.

Richard Ruiz was terminated from employment in September 1994 upon the conclusion of the ISU's investigation into his alleged sexual misconduct with inmates. Though he did undergo a pretermination *Skelly* hearing, Ruiz initiated and then withdrew review of his termination with the State Personnel Board (Board).[1]

In early October 1994, Ruiz and Gantong each filed a complaint with the Department of Fair Employment and Housing (DFEH) alleging discrimination in violation of the California Fair Employment and Housing Act (FEHA).[2] The DFEH sent both parties a "right to sue" letter shortly thereafter.[3] On May 2, 1995, they filed suit in Madera County Superior Court against the Department, the CCWF, Teena Farmon (the warden), and James Gomez (Director of the Department). The first cause of action alleged Ruiz had been discriminated against based upon his national origin, sex, and marital status. The second cause of action alleged Gantong had been harassed and discriminated against based upon her national origin, sex, and marital status.

Defendants filed a motion for summary judgment in August 1996. The court granted the motion as to the individual defendants only and the case went to trial against the Department and CCWF (hereafter collectively referred to as Department) on September 30, 1996.

---

[1] *Skelly v. State Personnel Bd.* (1975) 15 Cal.3d 194 [124 Cal.Rptr. 14, 539 P.2d 774].

[2] Government Code section 12900 et seq. All further statutory references are to the Government Code unless otherwise noted.

[3] A "right to sue" letter indicates the DFEH has declined to pursue the matter and serves to inform the recipient that he or she has one year from the date of the letter to initiate a private lawsuit under the FEHA.

On the first day of trial, the Department filed a motion for judgment on the pleadings against Ruiz, contending he had failed to exhaust his administrative remedies. The court granted the motion after concluding "[Ruiz] failed to exhaust his administrative remedies in not going to the state personnel board who could have granted him full relief. . . ."

On October 10, at the close of Gantong's case, the court granted the Department's motion for nonsuit after concluding she had failed to produce any evidence of discrimination. Four months later, on February 10, 1997, the court granted the Department's motion for attorney fees and costs. It ordered Ruiz and Gantong jointly and severally liable for $109,847 in attorney fees and $9,100.31 in costs. In addition, the court ordered Gantong individually to pay $19,648 in attorney fees and $5,601 in costs. Ruiz was held individually liable for $122 in attorney fees.

Ruiz and Gantong filed timely appeals. In the event appellants are successful, the Department cross-appealed the court's denial of its motion for summary judgment.

## Discussion

I. *Because Ruiz had exhausted his administrative remedies, the trial court erred when it granted the Department's motion for judgment on the pleadings.*

Ruiz contends the trial court erred when it granted the Department's motion for judgment on the pleadings after determining he had not exhausted his administrative remedies through the Board. He cites *State Personnel Bd. v. Fair Employment & Housing Com.* (1985) 39 Cal.3d 422 [217 Cal.Rptr. 16, 703 P.2d 354] (*State Personnel Bd.*) as authority for the proposition that a civil service employee need not necessarily seek review from the Board but, rather, has the option of pursuing an administrative remedy either through the Board or the DFEH.

In *State Personnel Bd.*, appellants unsuccessfully applied for positions with the California Highway Patrol. They appealed to the Board and also filed complaints with the DFEH. The DFEH found cause to believe unfair employment practices had occurred and moved forward on the claim. The Board thereafter filed an action to enjoin the DFEH from exercising jurisdiction over the claims. The trial court granted the injunction, concluding article VII of the California Constitution gave the Board exclusive jurisdiction over all matters involving state civil service employees. The California Supreme Court reversed and dissolved the injunction. It found state civil

service employees were covered by the FEHA, as are private employees. It then noted that the differing purposes of each agency, as well as the different procedural and evidentiary guidelines that are followed in either forum, supported the conclusion that the agencies maintained concurrent jurisdiction. Finally, the court found application of the FEHA to state employees constitutional. "[T]he Legislature is not restrained by article VII of establishing other agencies, such as those established by the FEHA, whose specialized watchdog functions might involve consideration of matters also within the purview of the Board. [Citation.]" (39 Cal.3d at p. 439, italics omitted.)

Ruiz contends the holding in *State Personnel Bd.* should be interpreted to mean an aggrieved state employee has the choice of seeking redress from either the Board or the DFEH. He chose the latter and, upon receipt of a "right to sue" letter, sought redress in the courts in accordance with the FEHA. The Department counters that a careful reading of *State Personnel Bd.* reveals that the case simply held that state employees are entitled to pursue their discrimination claims with the DFEH in addition to their claims with the Board. It does not, the Department argues, hold that state employees may entirely forgo review through the Board. It is the Department's position that state employees must pursue their claims with the Board, even if they also elect to seek relief with the DFEH.

We conclude Ruiz is correct. We find the principles set forth in *State Personnel Bd.* compel us to conclude that state employees are entitled to seek review of their claims in whichever forum they consider appropriate. "The Legislature's intent was to give public employees the same tools in the battle against employment discrimination that are available to private employees. The FEHA was meant to supplement, not supplant or be supplanted by, existing antidiscrimination remedies, in order to give employees the maximum opportunity to vindicate their civil rights against discrimination . . . ." (*State Personnel Bd.*, *supra*, 39 Cal.3d at p. 431.)

We interpret the language and meaning of *State Personnel Bd.* to support an expansive view of the avenues aggrieved state employees may pursue when filing their complaints. The Supreme Court took care to explain the differences between the two forums, emphasizing that the antidiscrimination provisions of the FEHA were more extensive than those in the Civil Service Act. "[G]iven the differences between the two statutory schemes, the Legislature's desire to include state employees within the purview of the FEHA, notwithstanding their coverage by the antidiscrimination provisions of the Civil Service Act, is understandable. The procedures, protections and enforcement services available to discrimination claimants under the FEHA go

beyond those available under the Civil Service Act. . . ." (*State Pesonnel Bd., supra,* 39 Cal.3d at p. 431, fn. omitted.) As such, we cannot agree all state employees who allege they were terminated for discriminatory reasons must file a claim with the Board. Instead, they may conclude it would be in their best interest to focus their energies on a claim with the DFEH. Also, the Supreme Court's attention on the different purposes of the two agencies suggests it would be proper for a potential claimant to consider which forum would be more appropriate for his or her cause of action. The court noted the Board's responsibilities center on ensuring that state appointments are based upon merit (§ 18500), while the FEHA was implemented to eliminate discrimination and to vindicate civil rights. (§ 12920.) Thus, aggrieved state employees may determine the facts underlying the complaint better comport with the purpose behind the FEHA and, accordingly, pursue redress solely with the DFEH.

Review of additional cases indicates a strong public policy of giving employees the opportunity—in a process that is economical, expedient, and straightforward—to challenge alleged discriminatory employment practices in whichever forum they choose. "[The Legislature intended] to create new rights within the FEHA statutory scheme while leaving existing rights intact. . . ." (*Jennings v. Marralle* (1994) 8 Cal.4th 121, 135 [32 Cal.Rptr.2d 275, 876 P.2d 1074]; see also *City of Moorpark v. Superior Court* (1998) 18 Cal.4th 1143 [77 Cal.Rptr.2d 445, 959 P.2d 752]; *Rojo v. Kliger* (1990) 52 Cal.3d 65 [276 Cal.Rptr. 130, 801 P.2d 373]; *Swartzendruber v. City of San Diego* (1992) 3 Cal.App.4th 896 [5 Cal.Rptr.2d 64].) Though "we do not decide cases based on trends" (*City of Moorpark v. Superior Court, supra,* 18 Cal.4th at p. 1156), we cannot ignore the principles that underscore these cases. Clearly, it is the policy of both the Legislature and the courts to give employees the opportunity to seek redress of their discrimination claims in a process that is as simple and procedurally clear as possible. This must include the option of filing claims in multiple forums or just one, whichever one that might be. Indeed, the Department's argument that state employees must pursue their claims through the Board has previously been rejected in rather summary fashion.

"We fail to understand why the State continues to urge on appeal as it did in the trial court that Watson may not prevail because she has not exhausted her civil service administrative remedies. She need not have done so as the State well knows because Watson had a choice between her civil service remedies and those provided by The Fair Employment and Housing Act. (Gov. Code, § 12940 et seq.; *State Personnel Bd.* v. *Fair Employment Housing Com.* (1985) 39 Cal.3d 422, 429, 431 . . . .) She chose to file her first charge with the DFEP and proceed accordingly. Watson complied with the

procedures required under the act, received her 'right to sue' letter and timely filed her suit. [Citation.] Because the State Attorney General knows the law in this area, we can only regard the argument as frivolous." (*Watson v. Department of Rehabilitation* (1989) 212 Cal.App.3d 1271, 1284-1285 [261 Cal.Rptr. 204].)

We are also mindful of the practical considerations state employees face upon the decision to file a claim. To conclude that state employees must seek review of their discrimination claims through the Board, regardless of their decision to pursue that claim with other agencies, places a burden upon those aggrieved individuals that private employees do not share. Aside from the potential equal protection problems this raises, it also presents the possibility of a procedural minefield. Not only must the state employee, as well as the state employer, struggle to comply with the substantive and procedural requirements of each agency, but there arises a potential problem with the statute of limitations. Claimants who unsuccessfully appeal their termination with the Board must file a writ in the trial court if they wish to challenge the findings of the Board. Otherwise, they are bound by the factual findings of the Board in future litigation. (*Knickerbocker v. City of Stockton* (1988) 199 Cal.App.3d 235, 240-244 [244 Cal.Rptr. 764]; *Oquendo v. California Institution for Women* (1989) 212 Cal.App.3d 520 [260 Cal.Rptr. 688].) In the meantime, however, these same claimants must consider the strict statutory deadlines of the DFEH if they wish to file a subsequent or simultaneous complaint with that agency as well. According to the Department, claimants who receive their "right to sue" letters from the DFEH cannot initiate their lawsuits because they must wait until their administrative process through the Board is exhausted, a wait that could affect filing deadlines with the trial court. Moreover, to avoid collateral estoppel of issues decided by the Board, these same claimants must also wait until their writ to the trial court has been decided before initiating legal action. (*Ibid.*) Though the doctrine of equitable tolling could possibly remedy this problem, the fact remains that the failure of state employees to meet statutory deadlines would be a potential argument by employers in future litigation, adding another obstacle for employees.

Finally, we note our holding today comports with the well-settled doctrine of exhaustion of administrative remedies. ■ "[T]he rule is that where an administrative remedy is provided by statute, relief must be sought from the administrative body and this remedy exhausted before the courts will act. . . ." (*Abelleira v. District Court of Appeal* (1941) 17 Cal.2d 280, 292 [109 P.2d 942, 132 A.L.R. 715].) ■ In this instance, Ruiz exhausted the administrative process required under the FEHA before initiating a lawsuit in the courts. That is the administrative forum he chose, and he fulfilled its requirements before turning to the courts.

For these reasons, we hold state employees may pursue their claims of employment discrimination with either the Board or the DFEH or both. Accordingly, we find Ruiz did exhaust his administrative remedies upon receipt of his "right to sue" letter from the DFEH. He thereafter initiated legal action and his case was properly brought before the court. Therefore, we conclude the trial court erred when it granted the Department's motion for judgment on the pleadings.

II.-IV.*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

### DISPOSITION

The judgment on the pleadings against Ruiz is reversed and remanded. The judgment for nonsuit against Gantong is reversed and remanded. The order for attorney fees and costs is reversed in its entirety. The denial of Department's motion for summary judgment is affirmed. Ruiz and Gantong are awarded their costs on appeal.

Vartabedian, Acting P. J., and Wiseman, J., concurred.

---

*See footnote, *ante*, page 891.