9 P.3d 657

2000-NMCA-074

**Ronald MARTINEZ, Petitioner–Appellant,**

v.

**NEW MEXICO STATE ENGINEER OFFICE and New Mexico State Personnel Board, Respondents–Appellees.**

No. 19,621.

Court of Appeals of New Mexico.

June 29, 2000.

Certiorari Denied Aug. 15, 2000.

*OPINION*

SUTIN, Judge.

{1} This appeal raises the issue whether the New Mexico State Personnel Board is to adjudicate statutory disability discrimination claims in administrative just cause termination proceedings. The terminated employee in this case had a bipolar disorder.

{2} Ronald Martinez appeals the district court's judgment affirming the decision of the New Mexico State Personnel Board (the Board). That decision upheld his dismissal from employment with the New Mexico State Engineer Office (the SEO). After a hearing, the Administrative Law Judge (the ALJ) entered a recommended decision proposing to find that Martinez engaged in misconduct, insubordination, and abusive and threatening behavior toward employees constituting just cause for dismissal. The Board adopted the proposed findings of fact and conclusions of law of the ALJ and dismissed Martinez's appeal, and the district court affirmed.

{3} On appeal to this Court, in addition to a contention that the finding of just cause was not supportable, Martinez contends: (1) the decisions of the Board and the district court were erroneous because the ALJ did not properly consider Martinez's mental disability or the Americans with Disabilities Act of 1990(ADA), 42 U.S.C. §§ 12111 to 12117, in determining whether there was just cause to discharge him; (2) Martinez was denied due process because he was not afforded progressive discipline under the Board Rules; and (3) the district court erred by granting the SEO's motion to supplement the record on appeal to the district court. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

{4} Martinez was employed in the Hydrographic Survey Bureau (the Bureau) of the SEO for nine years, from April 1987 to April 1996. Martinez suffers from bipolar affective disorder, also commonly referred to as manic-depression. Bipolar disorder is a psychiatric disorder caused by a chemical imbalance

Aaron Bartels, Santa Fe, NM, for Appellant.

Marcia E. Lubar, Marcia E. Lubar & Associates, Albuquerque, NM, for Appellee, NM State Engineer Office.

and requires continuous medical treatment, usually in the form of lithium therapy. The disorder is characterized by extreme mood swings from severe depression to manic elation. Martinez was diagnosed with the disorder in 1989. Following hospitalization in 1992, Martinez had his treating physician inform his supervisor at the Bureau, Edward Ytuarte, of his medical diagnosis. The psychiatrist explained to Ytuarte that bipolar disorder could be successfully treated with lithium and that Martinez's prognosis was excellent if he complied with treatment. Prior to the diagnosis of bipolar disorder, Martinez had consistently been a good and reliable employee at the Bureau.

{5} After learning of Martinez's condition, his supervisors made efforts to work with him and to accommodate his disability by granting him leave of absence whenever he needed medical treatment or hospitalization. As a condition to returning to work, however, Martinez was required to obtain a release from his doctor certifying that he was fit to work. Eventually, by word of mouth, other employees in the Bureau became aware of Martinez's disorder and his need to control it with medication.

{6} Between 1992 and 1994, Martinez was stable, performed satisfactorily, and was promoted several times. By spring 1995, however, his conduct in the workplace deteriorated, as he became increasingly unstable and disruptive. He had problems concentrating, could not complete simple work tasks, and refused to take direction from his supervisors. Often he disappeared from the workplace without supervisor permission and without approved leave. One supervisor reported that Martinez had become increasingly disruptive, demanding, obnoxious, and abusive toward him and other employees. His opinion was that Martinez's behavior problems were getting out of control and that he needed medical attention which could not be provided in the workplace. He also believed Martinez was a danger to himself and others, stating, "I am afraid that he is going to get violent one of these days."

{7} On May 18, 1995, a coworker, Alice Mayer, complained that Martinez entered her office and violated her "personal comfort zone" by sitting extremely close to her, staring at her, and telling her that her "teeth looked pretty today." Mayer reported that she felt she was being watched by Martinez. Although she went to great lengths to avoid Martinez, she believed that he was keeping track of her because he often appeared during her breaks and knew when she was planning to take leave. Mayer complained to management because she saw a pattern emerging and was worried about the effect of Martinez's aggressive and unpredictable behavior on her and other employees.

{8} Ytuarte, as the Bureau Chief, dealt with these complaints by counseling Martinez in person. He also placed Martinez on administrative leave with pay for five days so that he could "get some rest" and "some medical attention." Ytuarte required that Martinez return to work with a release from a qualified doctor certifying that he was fit to work and in a state of mind in which he could be responsible for his actions and not a threat to himself and others. Martinez was hospitalized in May and did not return to work until late June 1995. He was hospitalized again from November 16 to November 20, 1995, and again from December 6 to December 12, 1995, each time returning to work with a doctor's release.

{9} Whenever Martinez returned to work, however, his disturbing and erratic behavior persisted. Nonetheless, Ytuarte continued to accommodate Martinez by finding tasks that he could perform and by reassigning him to different supervisors. Ytuarte also sought assistance from Martinez's father and other relatives. On several occasions, Martinez's father was summoned to the workplace to address Martinez's behavior problems or to escort him to the hospital with the police when his behavior became intractable. Ytuarte also repeatedly counseled Martinez about the need to stay focused, stay at his work station, perform his job, get along with others and, most importantly, about the need to take his medication.

{10} Martinez's aggressive and confrontational behavior intensified on February 16, 1996. Early that morning, he went to Mayer's office where she was alone. He demanded that she hug him because she would soon

be leaving the Bureau. Although she refused, Martinez insisted on a hug. Eventually, he stopped the improper behavior when he saw another employee approaching. Mayer testified that, during the encounter, she felt trapped by Martinez, was frightened by his conduct and believed she was put in a dangerous and threatening situation.

{11} Immediately following the encounter with Mayer, Martinez initiated a confrontation with his then immediate supervisor, Max Chavez. Martinez demanded to know why Chavez had logged four hours of annual leave on Martinez's timesheet for the previous day. Chavez responded that he had seen Martinez leave that day at approximately 1:00 p.m. without requesting leave or informing anyone that he was leaving. Martinez then became belligerent and began swearing at Chavez. When Chavez instructed Martinez to return to his work area, he became even more abusive and continued cursing at Chavez. As the confrontation escalated, Martinez stood up in a defiant and threatening manner, as if to throw a punch at Chavez. Chavez reported the incident to Ytuarte, believing that his safety was endangered by Martinez.

{12} When Ytuarte later met with Martinez to discuss his confrontation with Chavez, Martinez refused to accept any responsibility for the incident and stated he was being harassed by Chavez. Ytuarte then sent Martinez home and directed him to report back on the morning of February 19, 1996, to continue discussing the matter.

{13} On February 19, Ytuarte informed Martinez that his threatening and abusive conduct would no longer be tolerated. He was urged to get medical attention and to cooperate with his family. Ytuarte testified that, during the meeting, Martinez was upset, disoriented and went off on tangents, at one point talking about his experience in the Army. Believing he was being fired, Martinez began yelling at Ytuarte and then abruptly left his office. As he was leaving the building, he saw and approached Chavez, pointed at him and stated angrily, "I'm going to kick your ass, boy." Chavez testified that he took Martinez's threat seriously. Other employees who witnessed the encounter indicated that they, too, believed Martinez to be a threat to Chavez and to others in the workplace.

{14} Upon overhearing the threat against Chavez and interviewing other employees, Ytuarte determined that Martinez had crossed the line by threatening his supervisor and that his behavior posed a threat to all the employees at the Bureau. Ytuarte testified that at that point he recommended that Martinez be discharged on the grounds of misconduct, insubordination, and threats of physical violence against his supervisor.

{15} On March 4, 1996, while hospitalized at the Las Vegas Medical Center, Martinez contacted the workplace again by telephone. He asked the receptionist if everyone at the Bureau was afraid to come to work because of him and demanded to know who had accused him of sexual harassment. He then stated that if he was fired because of Chavez, he would "finish him off." The telephone call was reported to Bureau management and the Santa Fe police department.

{16} Martinez was issued a notice of contemplated termination by the SEO on March 19, 1996. The notice set forth the reasons for dismissal, including "continued unsatisfactory performance, workplace misconduct, insubordination, and threats of physical abuse directed toward agency employees," and described the incidents occurring in May 1995 and February 1996. Following a pre-termination hearing, Martinez's employment with the Bureau was terminated. A notice of final action was served on April 10, 1996. Martinez appealed his termination to the Board on the grounds that the SEO did not properly consider his disability in terminating him, his behavior did not rise to the level of misconduct justifying termination, and he was denied progressive discipline. Following a hearing before an ALJ, and the ALJ's "recommended decision", the Board upheld Martinez's termination for just cause on the grounds of misconduct, insubordination, and threats of physical abuse.

{17} Martinez appealed the Board's decision, and the district court determined that substantial evidence existed in the record for the ALJ to have concluded that Martinez engaged in misconduct and was terminated

for cause, and that "termination was the appropriate discipline and progressive discipline was not necessary." The district court further determined that "the decision of the ... Board was not arbitrary, capricious or an abuse of discretion."

## II. DISCUSSION

### A. Whether the Board Has Authority to Decide ADA Issues in Personnel Appeal

{18} On appeal, Martinez contends that the Board did not properly apply the ADA and the Equal Employment Opportunity Commission (EEOC) guidelines in determining whether the SEO had just cause to dismiss him. We note that initially Martinez did not raise the ADA in the proceedings below. He argued only that the SEO failed to take into account his disability in terminating him and that his behavior did not rise to the level of misconduct justifying immediate dismissal. Instead, it was the SEO who injected the ADA into this case. In response to Martinez's arguments, the SEO argued that Martinez was terminated in compliance with the ADA. However, neither the ALJ nor the Board specifically referred to the ADA in their written decisions finding just cause to terminate Martinez. In filed exceptions to the ALJ's proposed findings and conclusions, Martinez argued that his termination violated the ADA and the EEOC guidelines, and that the ALJ's recommended decision was contrary to ADA law.

{19} The SEO argues that New Mexico courts do not have jurisdiction to determine issues under the ADA because Martinez failed to appeal a "no probable cause" determination issued by the New Mexico Human Rights Commission (NMHRC) on May 28, 1997, on the issue of discrimination. The SEO also asserts that the Board is without authority to decide claims of discrimination under the ADA and that only the NMHRC is vested with such authority pursuant to the New Mexico Human Rights Act (NMHRA), NMSA 1978, §§ 28–1–1 to –7, 28–1–9 to –14 (1969, as amended through 1995). Finally, the SEO argues that, even applying the ADA to this case, Martinez is not entitled to relief because he is not a qualified individual with a disability, the SEO had a right to discharge a potentially violent and insubordinate employee, and no reasonable accommodation by the SEO would enable Martinez to perform the essential functions of his job.

{20} The threshold issue for us is whether the Board has authority to determine ADA issues in an administrative appeal under the Personnel Act. See NMSA 1978, § 10–9–1, and various sections up to and including 10–9–25 (1961). This is a question of law which we review de novo. See Hyden v. New Mexico Human Servs. Dep't, 2000–NMCA–002, ¶ 12, 128 N.M. 423, 993 P.2d 740.

{21} The district court, in upholding Martinez's dismissal, concluded that the district court did not have jurisdiction to consider claims under the ADA or the NMHRA because Martinez did not appeal the NMHRD's determination of no probable cause. For slightly different reasons, we conclude that the Board and the district court properly refrained from deciding issues under the ADA. See In re Drummond, 1997–NMCA–094, ¶ 12, 123 N.M. 727, 945 P.2d 457 (noting that "we may affirm the court's decision if it is right for any reason and affirming on a different ground would not be unfair to the appellant").

{22} The Board is a public administrative body created by statute. See NMSA 1978, § 10–9–8 (1980); State ex rel. New Mexico Highway Dep't v. Silva, 98 N.M. 549, 551, 650 P.2d 833, 835 (Ct.App.1982). Therefore, the Board is limited to the power and authority expressly granted or necessarily implied by statute, see PNM Elec. Servs. v. New Mexico Pub. Util. Comm'n (In re Application of PNM Elec. Servs.), 1998–NMSC–017, ¶ 10, 125 N.M. 302, 961 P.2d 147, which expressly defines its duties. See NMSA 1978, § 10–9–10 (1983). Among the primary duties of the Board is the power to promulgate rules to carry out the provisions of the Personnel Act and to hear appeals by state employees aggrieved by an agency's action affecting their employment. See § 10–9–10(A) and (B). Thus, the Board has both policy-making and quasi-judicial responsibilities. See Montoya v. Dep't of Fin. &

*Admin.,* 98 N.M. 408, 412, 649 P.2d 476, 480 (Ct.App.1982).

{23} In hearing appeals and thus acting in its quasi-judicial capacity, the Board conducts evidentiary hearings and makes findings of fact and conclusions of law. *See id.* at 413, 649 P.2d at 481. In particular, NMSA 1978, § 10–9–18(F) (1980), imposes on the Board the duty of determining whether action taken by an agency against an employee "was without just cause." *Silva,* 98 N.M. at 551, 650 P.2d at 835. If the Board determines the agency action was unsupported by just cause, the Board "may modify the disciplinary action or order the agency to reinstate the appealing employee to his former position or to a position of like status and pay." Section 10–9–18(F).

{24} Neither the Personnel Act nor the rules promulgated under the Personnel Act by the Board (the Board Rules) expressly grant the Board the power to resolve claims of discrimination raised by an employee challenging an agency's adverse personnel action. New Mexico courts have not previously addressed whether the Board has implied authority to address complaints of unlawful employment discrimination in a termination proceeding based on just cause under the Board Rules.

{25} Our review of case law from other jurisdictions has revealed sparse authority on this point. We note, however, that in some jurisdictions state personnel boards are expressly empowered by statute or regulation to consider claims of discrimination in administrative personnel proceedings. *See, e.g., Ruiz v. California Dep't of Corrections,* 77 Cal.App.4th 891, 92 Cal.Rptr.2d 139, 143 (2000); *Cunningham v. Dep't of Highways,* 823 P.2d 1377, 1380 (Colo.Ct.App.1991); *Cantrell v. State of Georgia,* 129 Ga.App. 465, 200 S.E.2d 163, 166 (.1973); *Walker v. Dep't of Pub. Works Sewerage,* 549 So.2d 426, 428 (La.Ct.App.1989).

{26} However, such provisions are absent from the Personnel Act and the Board Rules. Furthermore, we find no provision in the NMHRA that impliedly or expressly permits a state employee to adjudicate discrimination claims through the Board in termination proceedings under the Board Rules. Although

we recognize that "[l]egislative silence is at best a tenuous guide to determining legislative intent," *Swink v. Fingado,* 115 N.M. 275, 283, 850 P.2d 978, 986 (1993), we conclude that had the Legislature intended for the Board to share authority with the NMHRC or to decide claims alleging violations of state and federal discrimination laws, it would have expressly conferred such authority on the Board and established a procedural mechanism for considering such claims in a manner that would not conflict with the authority of the NMHRC or the administration of the statutory law against discrimination.

■ {279B In the absence of explicit language in the Personnel Act and the Board Rules, we conclude that the authority to decide whether a violation of the ADA or the NMHRA has occurred rests exclusively with those administrative agencies, such as the EEOC and the NMHRC, who have express statutory authority to adjudicate such claims and have specialized knowledge and expertise in preventing and remedying unlawful discrimination. *Cf. Ex parte Boyette,* 728 So.2d 644, 645–46 (Ala.1998) (per curiam); *Hawkins v. State,* 183 Ariz. 100, 900 P.2d 1236, 1240–41 (Ct.App.1995). Accordingly, an employee who asserts the absence of just cause based on unlawful discriminatory practices in violation of the ADA or the NMHRA must pursue his claim through the EEOC or the NMHRC, using the mandatory grievance procedures set forth in the respective statutes. *See Jaramillo v. J.C. Penney Co.,* 102 N.M. 272, 272–73, 694 P.2d 528, 528–29 (Ct.App.1985) (stating that because the NMHRA provides the right, procedure and remedy, the statutory grievance procedure is mandatory when unlawful discriminatory practices are alleged); *see also Dao v. Auchan Hypermarket,* 96 F.3d 787, 788–89 (5th Cir.1996) (explaining that, before filing ADA action in federal court, employee must file timely charge with the EEOC or with a state or local agency with authority to grant relief from alleged unlawful discrimination). The Board is without express or implied authority to adjudicate issues under the ADA or the NMHRA in a personnel proceeding. Here, the Board correctly declined to decide ADA claims.

■ {28} Martinez nevertheless points out that the Board Rules included a Purpose Statement which enumerated several principles to be followed by the Board, including:

Fair treatment of applicants and employees in all aspects shall be assured for applicants and employees in all aspects of personnel administration without regard to race, color, religion, sex, national origin, political affiliation, age, *disability,* or other non-merit factors, and with proper regard for their primary and constitutional rights as citizens, shall be assured.

State Personnel Board Rules—Purpose Statement (January 2, 1993) (emphasis added). This non-discrimination policy statement is not a contractual carte blanche for adjudication of discrimination claims in personnel proceedings. However, that is not to say that an employee's disability can never be raised in those proceedings. While we have held that the Board is without authority to determine violations under the ADA or the NMHRA, that holding shall not preclude an employee from raising his or her disability in a personnel proceeding to show that the agency's proffered reasons for its action are pretextual and that the real reason for the action was his or her disability. We note this is essentially what Martinez did in this case.

{29} Thus, an ALJ as an evidentiary matter may decide whether the reasons offered by the employer for a termination are pretext for discrimination because of the employee's disability. However, for the reasons discussed above, we conclude that the Board may not determine whether there was a statutory violation of state and federal laws prohibiting discrimination; at least in the administrative context, that authority rests solely with the NMHRD and the EEOC. In short, we conclude that the ALJ and the Board acted appropriately by not determining issues under the ADA. Therefore, we do not consider the parties' arguments regarding whether Martinez was terminated in violation of the ADA.

## B. Whether the Board's Just Cause Determination is Supportable

■ {30} Next, we consider whether the Board's determination that Martinez was terminated with just cause was arbitrary and capricious, not supported by substantial evidence, or otherwise contrary to law. In order to find just cause, "the Board is required to determine not only that there was employee misconduct but also that the agency's discipline was appropriate in light of that misconduct." *Gallegos v. New Mexico State Corrections Dep't,* 115 N.M. 797, 802, 858 P.2d 1276, 1281 (Ct.App.1992); *see Silva,* 98 N.M. at 552, 650 P.2d at 836. While the first prong focuses on the nature of the employee's conduct, the second prong focuses on the reasonableness of the agency's disciplinary action. *See Gallegos,* 115 N.M. at 802, 858 P.2d at 1281.

■ {31} We apply a whole-record standard of review in considering appeals from an administrative decision by the Board. *See Clark v. New Mexico Children, Youth & Families Dep't,* 1999–NMCA–114, ¶ 7, 128 N.M. 18, 988 P.2d 888. Like the district court, we independently review the entire record of the administrative hearing to determine whether the Board's decision was arbitrary and capricious, not supported by substantial evidence, or otherwise not in accordance with law. *See id.;* NMSA 1978, § 10–9–18(G) (1980, prior to 1998 and 1999 amendments).

■ {32} Just cause occurs when an employee engages in behavior inconsistent with the employee's position and can include, among other things, incompetency, misconduct, negligence, insubordination, or continuous unsatisfactory performance. *See* Board Rule 17.3 (March 26, 1994). Based on our review of the whole record, we conclude that substantial evidence exists to support the ALJ's finding and the Board's adoption of the finding of just cause to terminate Martinez based on misconduct, insubordination, and abusive and threatening behavior toward employees on February 16 and 19, and March 4, 1996.

{33} Martinez argues that dismissal was improper in light of his known disability. However, the record demonstrates that the Bureau made active and continuous efforts, beginning in 1992, to accommodate Martinez's disability. Ytuarte granted Martinez

leave to seek medical treatment, reassigned him to different supervisors when conflicts arose, gave him simple and manageable assignments when he was unable to concentrate, consulted with his family about his worsening condition, and repeatedly counseled him to take his medication. Despite these efforts, Martinez's behavior continued to deteriorate. The incidents in May 1995 and February 1996 suggested that Martinez was unable to control his disability. His physician stated in 1992 that his condition could be managed with lithium if Martinez complied with the prescribed treatment, though infrequent "break through" episodes were always possible.

{34} Although Martinez testified that he always complied with his doctor's orders, there is evidence in the record that he did not take his medication regularly. One employee testified that on several occasions Martinez told her that he was not taking his medication because he did not think he needed it. Moreover, although there was no medical testimony presented at the hearing, Martinez's frequent hospitalizations in 1995 and 1996 suggested that he was having difficulty regulating his blood lithium level and may not have conscientiously been following his medication prescriptions. According to one medical release in his personnel file, he was in need of "medical regulation" when he was admitted to the hospital on November 16, 1995. In yet another release, dated March 29, 1995, his treating physician stated that he could not guarantee that Martinez would take his medication on his own following his discharge from the hospital.

{35} In light of Martinez's misconduct in the workplace and his apparent failure to control a controllable disability, we conclude the district court's decision was neither arbitrary, capricious, nor contrary to law, and that the termination was appropriate. *See Gallegos,* 115 N.M. at 802, 858 P.2d at 1281; *cf. Fitzhugh v. New Mexico Dep't of Labor,* 1996–NMSC–044, ¶ 42, 122 N.M. 173, 922 P.2d 555 (misconduct justifying denial of unemployment benefits is conduct evincing callousness and deliberate or wanton misbehavior toward employer's interests and expectations).

{36} Martinez asserts that termination was too severe an action and that, under the *Gallegos* standard (whether the agency's discipline was appropriate in light of the misconduct), the discipline was inappropriate. *See Gallegos,* 115 N.M. at 802, 858 P.2d at 1281. We disagree. Martinez's conduct supported a just cause termination. Once it is determined that just cause exists to terminate, termination is appropriate under the Board Rules. *See Lujan,* 1999–NMCA–059, ¶¶ 17, 19, 127 N.M. 233, 979 P.2d 744.

### C. Progressive Discipline

{37} Martinez contends that he was denied due process because the SEO failed to provide him progressive discipline prior to his termination, contrary to the Board Rules and the SEO's policy manual. Though "violation of a state law requiring specific procedures does not necessarily constitute a violation of constitutional due process," *State ex rel. Hughes v. City of Albuquerque,* 113 N.M. 209, 210, 824 P.2d 349, 350 (Ct.App.1991), a public employee may be entitled to relief if the procedures mandated by the Board Rules and the administrative agency's employee handbook are not followed. *See Lujan,* 1999–NMCA–059, ¶ 20, 127 N.M. 233, 979 P.2d 744. We determine, however, that the ALJ was correct in determining that the SEO was not required to use progressive discipline and in concluding that Martinez was provided sufficient procedural due process.

{38} According to the Board Rules, the purpose of discipline is to correct unacceptable performance or behavior that is contrary to the employer's legitimate interests. *See* Board Rule 17.1(A) (March 26, 1994). "Progressive discipline shall be used whenever appropriate" and "can range from a reminder to an oral or written reprimand to a suspension, demotion or dismissal." *Id.* at 17.1(B). However, the Board Rules state that "[t]here are instances when a disciplinary action including dismissal is appropriate without first having imposed a less severe form of discipline." *Id.* Similarly, under the SEO's disciplinary policy, which incorporates by reference Board Rule 17, progressive discipline "is to be used to correct unacceptable behavior

and unsatisfactory performance whenever possible."

{39} Here, the ALJ concluded that Martinez's right to procedural due process was not violated, based on two findings of fact: the SEO (1) "followed a policy of progressive discipline" and (2) "was not required to use progressive discipline because of Martinez'[s] insubordination, misconduct in the workplace, and his abusive and threatening actions toward his supervisor." Viewing the record as a whole, we conclude that there is insufficient evidence in the record to support the ALJ's first finding of fact, but sufficient evidence to support his second.

{40} The record reveals that Ytuarte repeatedly verbally counseled Martinez about his performance and conduct troubles. Martinez was also given leave in order to obtain medical assistance for a condition that admittedly was a cause of these troubles. Martinez's personnel file also contained several memoranda from supervisors and coworkers documenting these problems. It is uncontroverted, however, that Martinez was not shown copies of the memoranda until after his dismissal and no one ever explained the disciplinary consequences of not correcting his behavior and performance problems. It is also undisputed that Martinez's performance appraisals did not note any of his conduct or performance problems. Moreover, Ytuarte testified that his counseling sessions with Martinez were not "disciplinary" in nature but merely "consultations" or "visits."

{41} At most, Martinez was only verbally reprimanded before his dismissal. It does not appear that he was ever reprimanded in writing, shown copies of the memoranda documenting his behavioral problems, or warned of the disciplinary consequences of his behavioral and performance deficiencies. This, we believe, is inconsistent with a progressive discipline scheme contemplated under the Board Rules. *See Lujan*, 1999–NMCA–059, ¶ 16, 127 N.M. 233, 979 P.2d 744 (when applying progressive discipline, employer has duty to adequately warn employee by identifying violation involved and consequences of violation); *see also Chicharello v. Employment Sec. Div.*, 1996–NMSC–077, ¶ 6, 122

N.M. 635, 930 P.2d 170. Therefore, considering the record as a whole, we find insufficient evidence that Martinez was afforded progressive discipline.

{42} The Board Rules state, however, that an employee may be subject to immediate dismissal in some instances without first imposing a less severe sanction. *See* Board Rule 17.1(B). In *Lujan*, we recognized that progressive discipline is not required before termination when the conduct for which an employee is terminated constitutes just cause to terminate. *Lujan*, 1999–NMCA–059, ¶¶ 17, 19, 127 N.M. 233, 979 P.2d 744. Martinez was terminated on the grounds of insubordination, misconduct, and threats of physical violence against his supervisor, all of which clearly fall within the category of conduct constituting just cause for dismissal. *See* Board Rule 17.3(B) (March 26, 1994). Moreover, Martinez's conduct posed a threat to the safety of other employees. His conduct resulted from a controllable, yet uncontrolled, psychiatric condition of which his employer was aware. That conduct constituted the type of serious misconduct which does not have to be tolerated by an employer and which justifies immediate dismissal.

{43} We conclude that the Board's decision was affirmable based on the ALJ's second finding of fact that the SEO was not required to apply progressive discipline under the facts of this case. That the ALJ determined that the SEO followed a policy of progressive discipline is of no consequence. Irrelevant and "[e]rroneous findings of fact not necessary to support the judgment ... are not grounds for reversal." *Sanchez v. N.M. Dep't of Labor*, 109 N.M. 447, 452, 786 P.2d 674, 679 (1990); *see also In re T.J.*, 1997–NMCA–021, ¶ 20, 123 N.M. 99, 934 P.2d 293 (noting that erroneous finding of fact is not ground for reversal where fact-finder entered other findings that support judgment); *cf. Davis v. Los Alamos Nat'l Lab.*, 108 N.M. 587, 591, 775 P.2d 1304, 1308 (Ct. App.1989) (affirming hearing officer's decision if right for any reason).

{44} Furthermore, while the history of Martinez's mental illness and resulting con-

duct and the SEO's consultations and accommodations preceding February and March 1996 cannot be considered in justifying the just cause basis of the termination, that history can properly be considered when evaluating the fairness of Martinez's treatment, *see* Purpose Statement, and the appropriateness of by-passing progressive discipline and determining that termination was the appropriate action under the circumstances.

{45} Therefore, in the case before us, the ALJ properly considered the history and entered findings regarding Martinez's psychiatric disorder, Martinez's "erratic and disruptive workplace behavior," repeated hospitalizations, and the SEO's counseling and continuing efforts to make accommodations for Martinez. Although falling a bit short of the formal progressive discipline contemplated under the Board Rules, this unique history was properly considered to place the cause of and concern about Martinez's conduct in the appropriate context.

{46} Martinez further argues that he was denied due process because the ALJ did not consider whether his termination resulted in disparate treatment. We do not consider this argument because it does not appear Martinez raised the argument below or presented any evidence of disparate treatment at the administrative hearing. *See Woolwine v. Furr's, Inc.*, 106 N.M. 492, 496, 745 P.2d 717, 721 (Ct.App.1987) (deciding that in order to preserve issue for review, it must appear that appellant fairly invoked a ruling of the trial court on same grounds argued on appeal). Moreover, Martinez does not cite any pertinent authorities in support of his contention. *See In re Adoption of Doe*, 100 N.M. 764, 765, 676 P.2d 1329, 1330 (1984) (stating that issues unsupported by cited authority will not be considered on appeal). Therefore, we do not consider the issue.

### D. Supplementation of Record on Appeal

{47} Finally, Martinez argues that the district court erred in granting the SEO's motion to supplement the record on appeal with a complete copy of the SEO's disciplinary policy. The Board had before it only one of five pages of the policy. In support of its motion, the SEO argued that it had inadvertently omitted the other pages of the policy and that the pages were material to Martinez's progressive discipline claim.

{48} Rule 1–074(I) NMRA 2000 provides:

> If anything material to either party is omitted from the record on appeal by error or accident, the parties by stipulation, or the agency on request, or the district court, on proper suggestion or on its own initiative, may direct that the omission be corrected and a supplemental record transmitted to the district court.

Martinez, however, correctly points out that in administrative appeals the district court is a reviewing court, not a fact-finder, and therefore may consider only evidence presented to the Board in the first instance. *See Zamora v. Village of Ruidoso Downs*, 120 N.M. 778, 782–84, 907 P.2d 182, 186–88 (1995) (defining whole record review of district court). Accordingly, we determine that Rule 1–074(I) cannot be read so broadly as to allow the addition of material in the record that was never presented to the Board in the first instance. Rather, Rule 1–074(I) is limited by the scope of the district court's review as described in *Zamora. See id.* Therefore, only material that was in fact presented below but was mistakenly or inadvertently omitted from the record may be included in a supplemental record.

{49} Accordingly, we conclude that the district court erred by supplementing the record on appeal with evidence that was never presented to the Board. However, we determine that such error was harmless in the absence of evidence in the record indicating that the district court relied on the supplemental record in affirming the Board's decision. The decision that Martinez was not entitled to progressive discipline was correct based on the limited provisions of the progressive discipline policy put before the Board. *See In re Estate of Heeter*, 113 N.M. 691, 695, 831 P.2d 990, 994 (Ct.App.1992) ("On appeal, error will not be corrected if it will not change the result."). Therefore, because Martinez has not demonstrated any prejudice, we affirm on this issue as well.

### III. CONCLUSION

{50} Based on the foregoing discussion, we conclude that (1) the Board does not have authority to determine issues under the ADA in an administrative proceeding pursuant to the Personnel Act; (2) the Board's determination of just cause is supported by substantial evidence; (3) the Board's decision was not arbitrary or capricious or contrary to law; (4) Martinez was not entitled to progressive discipline prior to dismissal and therefore was not deprived of due process; and (5) the district court's error in allowing the SEO to supplement the record on appeal was harmless. Therefore, we affirm the decisions of the Board and of the district court.

{51} **IT IS SO ORDERED.**

APODACA and ARMIJO, JJ., concur.