1996–NMSC–077

930 P.2d 170

**Gertrude CHICHARELLO,
Petitioner–Appellant,**

v.

**EMPLOYMENT SECURITY DIVISION,
NEW MEXICO DEPARTMENT OF
LABOR, Respondent–Appellee.**

No. 23,715.

Supreme Court of New Mexico.

Dec. 6, 1996.

Joel Jasperse, Gallup, for Appellant.

Douglas H. McKinnon, Jr., Albuquerque, for Appellee.

## OPINION

McKINNON, Justice.

(1) Gertrude Chicharello appeals from a district court judgment affirming the denial of unemployment benefits by the Employment Security Division of the New Mexico Department of Labor ("the Division"). The court found that the decision of a divided Board of Review, which disqualified Chicharello for unemployment benefits on grounds of work-related misconduct, was supported by substantial evidence. We review the Division's decision using a whole record review, *Duke City Lumber Co. v. New Mexico Envtl. Improvement Bd.*, 101 N.M. 291, 294, 681 P.2d 717, 720 (1984), to determine whether it was supported by substantial evidence, *Morningstar Water Users Ass'n v. New Mexico Pub. Util. Comm'n*, 120 N.M. 579, 582, 904 P.2d 28, 31 (1995). We hold that the Division's findings and conclusions are not supported by substantial evidence and therefore reverse the decisions of the district court and the Division.

(2) *Facts and proceedings.* Chicharello was employed as the medical records manager for over sixteen years at the Red Rock Care Center, serving as the department head when she was discharged. Kathleen Correa, a new administrator, disciplined Chicharello for failing to maintain residents' charts in a satisfactory manner and placed her on a thirty-day evaluation period beginning October 18, 1994. A "Condition of Employment" memo stated that "[i]f these charts are not acceptable within 30 days, your employment ... will be terminated." The Division's Appeals Bureau found that "[i]n a good faith

effort [Chicharello] corrected the deficiencies pointed out by the employer," and that "[b]ecause the claimant experienced personal problems, the employer extended her condition of employment." These findings went unchallenged in the subsequent appeal to the Board of Review. The extension was indefinite and no further termination warning was given.

(3) Correa told Chicharello that she would be reevaluated, but instead, at the second "evaluation" on March 15, she was discharged for "failure to comply with job duties." When Chicharello filed for unemployment benefits, they were initially granted. However, *now* alleging willful misconduct, Red Rock challenged the grant of benefits on appeal to the Appeals Bureau. The Bureau found that Chicharello had "failed to follow the employer's instructions, placing the facility and residents at risk." The Bureau concluded that Chicharello's "discharge was for reasons constituting misconduct connected with the work; therefore [she] was subject to disqualification from benefits." A divided Board of Review and the district court found that the Bureau's decision was supported by substantial evidence.

▬▬ *The standard and burden of proof.* Because the purpose of the unemployment statute is to ease the burden of involuntary unemployment upon the unemployed worker, an employer must "demonstrate more than the simple fact that the discharge was justifiable in reference to business interests." *Fitzhugh v. New Mexico Dep't of Labor,* 122 N.M. 173, 183, 922 P.2d 555, 565 (1996). Consequently, "[t]he employer bears the burden of proving that the employee was discharged for willful misconduct." *Id.* at 184, 922 P.2d at 566. " 'Misconduct' [warranting

denial of unemployment benefits] is limited to conduct in which employees bring about their own unemployment by such callousness, and deliberate or wanton misbehavior that they have given up any reasonable expectation of receiving unemployment benefits." *Id.* at 183, 922 P.2d at 565. The misconduct must be of a nature so as to "suggest ... culpability [equal to deliberate violations], wrongful intent, or evil design, or so as to reveal an intentional and substantial disregard of the employer's interests, or of the employee's duties and obligations to his employer." *Id.* at 184, 922 P.2d at 566 (quoting *Mitchell v. Lovington Good Samaritan Ctr., Inc.,* 89 N.M. 575, 577, 555 P.2d 696, 698 (1976) (in turn quoting *Boynton Cab Co. v. Neubeck,* 237 Wis. 249, 296 N.W. 636, 640 (1941))).

▬▬ [4] *An employer must demonstrate compliance with its progressive discipline policies to establish willful misconduct in cases involving only unsatisfactory job performance.* Chicharello argues that Red Rock should be estopped from denying benefits because it did not follow its own progressive disciplinary policy.[1] None of our previous opinions discuss the employer's burden of proving willful misconduct in situations in which the employer's claim is changed from unsatisfactory job performance to willful failure to carry out job responsibilities. In *Fitzhugh,* we stated that the employer's failure to give a final warning of termination for excessive absenteeism, as required by its progressive discipline policy, inured to the benefit of the employee in determining whether her behavior was sufficiently willful to deny unemployment benefits. *Id.* at 185–86, 922 P.2d at 567–68. In *Rodman v. New Mexico Employment Security Department,* 107 N.M. 758, 762, 764 P.2d 1316, 1320 (1988), we

---

1. Red Rock argues that the progressive discipline policy issue was not preserved for appeal, citing *Warren v. Employment Security Department,* 104 N.M. 518, 724 P.2d 227 (1986). Again, we remind counsel that "[t]he Legislature has provided that the formal rules of procedure do not have to be applied in unemployment compensation administrative hearings." *Id.* at 519, 724 P.2d at 228. Further, *Warren* is distinguishable. There, the employee sought to challenge a *factual* matter that had been conceded before the agency and in his brief-in-chief to the district court. *Id.*

at 520, 724 P.2d at 229. Here, Red Rock introduced the disciplinary procedure manual excerpts as one of its documents "demonstrating [Chicharello's] misconduct" and presented testimony indicating the procedures were followed. Chicharello's representative argued before the Appeals Bureau that Red Rock had not followed its disciplinary policies [SRP 225]. The Board of Review's dissent expressly stated that Red Rock had not followed its disciplinary policy. [SRP 587]. The issue was therefore sufficiently preserved for appellate review.

stated that evidence of previous termination warnings is relevant because it reflects the employee's attitude of willfulness in misconduct.

(5) Some states have applied a bright-line rule, holding that if an employer fails to follow the progressive discipline policy in effect, it can not later deny unemployment benefits. *See Richards Restaurant v. Lukins,* 667 N.E.2d 806, 809 (Ind.Ct.App.1996) (holding that because employer failed to show that it followed its progressive discipline policy, it failed to establish a prima facie right to deny benefits based on willful misconduct); *PMA Reinsurance Corp. v. Commonwealth,* 126 Pa.Cmwlth. 94, 558 A.2d 623, 626 (1989) ("The promulgation of specific rules puts employees on notice that the employer will not consider such conduct to be adverse to its interest until the requisite number of violations have been committed."); *Looney v. Commonwealth,* 108 Pa.Cmwlth. 308, 529 A.2d 612, 614 (1987) (stating that to be an adequate warning, the employer must identify the exact violation and the consequences of a violation); *Cooley v. Department of Emp. Sec.,* 138 Vt. 211, 414 A.2d 1154, 1155 (1980) (holding that tardiness was not substantial disregard of employer's interest, especially when policy on warnings not followed). This bright-line rule seems especially appropriate when the employer discharges for unsatisfactory job performance, which usually means inability to meet performance standards. *Cf. Lamb v. Tanner,* 178 Ga.App. 740, 344 S.E.2d 534, 535 (1986) (stating that " '[f]ault' means more than mere failure to perform one's work duties" and holding as a matter of law that the employee's "misconduct" for having de minimis cash drawer shortages, even after several warnings, could not be interpreted as willful misconduct sufficient to deny unemployment benefits).

■ (6) As a practical matter, such a rule encourages employers to follow their progressive discipline policies, thereby ensuring more stable employment and obviating the need for some terminations. Although we are reluctant to adopt a bright-line approach in all cases, we hold that in order to establish that Chicharello's deficient work perfor-

mance was in fact *willful* defiance of proscribed procedures, Red Rock was required to show that it sufficiently warned her of discharge after she had corrected other deficiencies.

■ (7) *The Division's conclusion of willful misconduct is not supported by substantial evidence in the whole record.* Red Rock's progressive discipline policy stated three different types of conduct that arguably were relevant to Chicharello's discharge. They are (1) "Failure to Meet Job Specifications", (2) "Failure to Follow Supervisor's Instructions," and (3) "Insubordination". Before termination for failure to meet job specifications, Red Rock was required to give two written counseling warnings. The discipline imposed for failure to follow a supervisor's instructions depended upon the seriousness of the offense, but an employee could be immediately discharged without warning for a sufficiently serious failure. An employee could also be immediately suspended pending investigation or discharged without warning for insubordination. To determine which of these three behaviors actually applied in Chicharello's case, and whether such behavior constituted willful misconduct, we examine how Red Rock characterized her behavior at the time and how it communicated with and otherwise treated her.

It is uncontroverted that Chicharello received only one written termination warning entitled "Failure to Comply with Company or Facility Policy." This deficient behavior falls into the "failure to meet job specifications" category set out above, which required two written warnings before termination. With the warning, Correa gave Chicharello a list of patient charts that needed to be serviced. Correa admitted that Chicharello corrected all of the deficiencies on the list, but asserted that she also expected Chicharello to do everything listed in her job description. Two audits were performed in February and March 1995, both revealing that the resident charts were disorganized and reflected incorrect information. Correa submitted department head meeting sign-in sheets to support her assertion that she had made Chicharello aware of these deficiencies, along with the rest of the department heads whose deficien-

cies were also generally discussed in the quality assurance meetings. However, there is no evidence that the deficiencies were individually discussed with Chicharello or that she was put on notice that they could result in her discharge. In fact, Correa admitted that she did not warn Chicharello of any adverse consequences such as discharge at these meetings, and several other departments were not in compliance with federal and state requirements.

(8) Red Rock emphasized to the Appeals Bureau that Chicharello's deficiencies had contributed to the facility being put on a 90–day probation for failure to follow regulations promulgated by the Department of Health and Human Services in April 1995. It also presented testimony that her failure to keep accurate patient records could compromise patient health. This testimony apparently served as the basis for the Bureau's conclusion that Chicharello had placed the facility and its patients at risk. There was no evidence, however, that these deficiencies were the result of anything but inadvertence, negligence, or inability to get the cooperation of other facility employees or physicians. Apparently Correa did not think the deficiencies were serious enough to discuss them individually with Chicharello after she corrected the initial problems in November 1994. Correa testified that she asked Chicharello individually why the charts were not in compliance and discussed the Human Services report with her on the day she terminated her.

(9) With regard to Chicharello's claimed failure to follow instructions, the January quality assurance meeting notes state "medical records provided with some ideas in correcting the problem," and Correa testified that she gave Chicharello a checklist as a guideline to follow. The February quality assurance meeting notes indicate that Chicharello was given a verbal request to "clean" the patient files. Correa testified

that after discussing the audits with the department heads, she told them "we're lacking here" and gave some general instructions on what was needed for compliance, noting that improvement was still needed. However, documentary evidence showed that between January and February 1995 the audit scores improved in the "progress notes" section. Correa also testified that she saw "a little bit of improvement" in Chicharello's performance in servicing the patient charts as late as February 16. In fact, in the March 1 quality assurance meeting notes, there were no comments or deficiencies noted for the medical records department.

(10) Both Chicharello (by letter to the Appeals Bureau) and Brenda Swan, a business manager who worked closely with Chicharello, (by affidavit) testified that it was difficult to obtain the necessary documents for entry of data into the patient charts and that Chicharello had no control over making the doctors sign off on orders or submit progress notes in a timely manner, these being areas of deficient performance.[2] Correa admitted that it was the doctors' responsibility to sign off on the progress notes and that Chicharello did "the majority of what was required" in her job description, completing some charts, but not all. Correa's testimony reflects that Chicharello was working overtime to attempt to do her job, had cured certain deficiencies, and was attempting to cure others, thereby showing some improvement. There simply was no evidence establishing that Chicharello willfully refused to follow Correa's instructions.

(11) Red Rock makes no claim that Chicharello was insubordinate except as a conclusory statement and the Appeals Bureau necessarily found that she was making "good faith" efforts to comply with instructions and to meet the specifications of her job, finding that she "in a good faith effort

---

**2.** Red Rock argues that the affidavit and letter were never "offered" at the hearing and were "not part of the legally introduced evidence of record." [AB at 15] We disagree. Both parties submitted their documentary evidence well in advance of the hearing as required by the notice of hearing. [SRP 214, 256, 272, 292] Given the procedural informality of the hearing process, it was not necessary to formally offer the docu-

ments. See *Fitzhugh*, 122 N.M. at 174, 922 P.2d at 556 ("The record in administrative cases can be characterized by procedural informality and inadequate documentation that would not be acceptable in a trial setting."). Certainly these documents were available for consideration by the hearing officer and were considered by the dissenting member of the Board of Review. [SRP 586–88]

... corrected the deficiencies" pointed out in her first evaluation. The fact that she did not ultimately comply with all job requirements by March 1995 is not indicative of willful misconduct or wanton disregard of Red Rock's rights or interests. Under these facts—that Chicharello had apparently improved to such a degree by February 16 that no other formal charges of failing to comply, termination warnings, or evaluations were given—Red Rock has failed to present sufficient evidence showing callousness or deliberate or wanton behavior. Also, Red Rock's argument that Chicharello's attendance at the department meetings in which deficiencies were generally discussed established its compliance with the progressive discipline policy requiring two written warnings before termination must fail.

■ (12) Significantly, *prior to* Red Rock's appeal Chicharello was never informed of or charged with insubordination, willful failure to follow directions, or gross negligence. Although at the hearing Correa made a legal conclusion that failure to perform in the manner Chicharello was instructed is insubordination, there is a distinction drawn in Red Rock's own progressive discipline policy between insubordination and failure to comply with job specifications. Chicharello was warned about and discharged only for the latter. Cf. *Brady v. Commonwealth*, 118 Pa.Cmwlth. 68, 544 A.2d 1085, 1086 (1988) (employer's promulgation of rules indicates what it considers to be willful misconduct). Further, in employment disputes that require warnings before termination for less serious offenses as part of a disciplinary policy, an employer is bound by the reason given the employee at the time of discharge. Cf. *Kestenbaum v. Pennzoil Co.*, 108 N.M. 20, 26–27, 766 P.2d 280, 286–87 (1988) (holding that in cases in which employment contract requires employer to give notice of specifics of charge and chance to defend before termination, the reasons actually given are the only ones on which the employer may rely for good cause at trial).

We distinguish this case from those in which the employee has committed a deliberate violation of a rule or order, or committed an affirmative act of misconduct that is grounds for immediate termination without notice or warning, cf. *Sanchez v. New Mexico Dep't of Labor*, 109 N.M. 447, 452, 786 P.2d 674, 679 (1990) (upholding denial of unemployment benefits to employee who had willfully violated reasonable and known rule prohibiting employees from opening or closing store alone, had failed to sign the log indicating his presence, and had disconnected the burglar alarm and did not reconnect it upon leaving the store), and from those in which the employee has formally been threatened with termination for specific misconduct, cf. *Rodman*, 107 N.M. at 762–64, 764 P.2d at 1320–22 (upholding denial of benefits to employee who, after two formal warnings, engaged in disruptive personal confrontations at work); *Mitchell v. Lovington Good Samaritan Ctr., Inc.*, 89 N.M. 575, 576–78, 555 P.2d 696, 697–98 (1976) (upholding denial of benefits to employee who, in series of incidents, had refused to follow medication orders for patients, called supervisors names, refused to follow dress codes, and engaged in uncooperative and unethical behavior).

The termination notice simply stated that Chicharello had not improved in her duties as medical records manager, and Correa testified that she was terminated for "failure to comply with her duties assigned," not for insubordination or gross negligence. Further, the Appeals Bureau made no findings indicative of willful disregard, intentional misconduct, or gross negligence to support a conclusion of callousness, evil design, or intentional and substantial disregard of Red Rock's interests. Cf. *In re Therrien*, 132 Vt. 535, 325 A.2d 357, 358 (1974) (reversing unemployment board of review's decision because there were no findings of substantial disregard of the employer's interest, either willful or culpably negligent, to support its conclusion that employee had waived right to unemployment compensation). Red Rock consistently gave "failure to comply" with instructions and failure to improve in her job responsibilities as its reason for termination. It apparently convinced the Appeals Bureau that willful misconduct and insubordination could be inferred or implied from Chicharello's knowledge of the audits indicating continuing deficiencies during the last three months of her employment. But, the post-

termination attempt to raise negligence or unsatisfactory work performance to the level of insubordination or willful misconduct, without following its progressive discipline policy, was untimely and unfair. Although it certainly may have been in Red Rock's best interests to terminate an employee whose performance after sixteen years was not to its liking, Red Rock failed to present substantial evidence that Chicharello's failures were intentional and deliberate. In short, the findings made did not support a conclusion that Chicharello had engaged in willful misconduct or "had given up any reasonable expectation of receiving unemployment benefits" as required by *Fitzhugh.* 122 N.M. at 183, 922 P.2d at 565.

(13) *Conclusion.* We therefore conclude that neither its findings nor substantial evidence support the Division's conclusion of willful misconduct under NMSA 1978, Section 51–1–7(B) (Repl.Pamp.1993). The decisions of the Division and the district court are reversed, and this case is remanded to the Division for further proceedings consistent with this opinion.

(14) **IT IS SO ORDERED.**

RANSOM and FRANCHINI, JJ., concur.

