2006-NMCA-024

129 P.3d 158

Stephen **SELMECZKI**, Petitioner–Appellant,

v.

**NEW MEXICO DEPARTMENT OF CORRECTIONS**, Respondent–Appellee.

**No. 24,646.**

Court of Appeals of New Mexico.

Jan. 12, 2006.

124

L. Helen Bennett, P.C., L. Helen Bennett, Albuquerque, NM, for Appellant.

New Mexico Department of Corrections, James R. Brewster, Deputy General Counsel, Santa Fe, NM, for Appellee.

**OPINION**

FRY, Judge.

{1} Stephen M. Selmeczki (Worker) appeals the termination of his employment with the Department of Corrections (the Department), which both the Personnel Board and the district court affirmed. The termination resulted from accusations that Worker slapped coins at the Secretary and Deputy Secretary of Corrections and cursed at them in relation to a lack of pay raises for correc-

tional officers. We conclude that the record in this case is sufficient to support the termination of Worker for intentional misconduct and such termination is consistent with New Mexico case law. Therefore, we reject Worker's contention that progressive discipline was required prior to termination of his employment where he engaged in intentional, hostile, and unprovoked conduct approaching a physical fight. We also conclude that Worker's argument that he had no notice of what behavior could result in termination was neither preserved for our review nor supported by authority.

## I. FACTUAL BACKGROUND

{2} We begin with uncontested background facts and then present the conflicting testimony given before the Personnel Board Administrative Law Judge (ALJ) regarding the confrontation itself. Our review of an administrative agency's findings of fact involves whole record review, *Regents of University of New Mexico v. New Mexico Federation of Teachers*, 1998–NMSC–020, ¶ 17, 125 N.M. 401, 962 P.2d 1236, so we recount testimony that is both favorable and unfavorable to Worker.

{3} At the time of his termination, Worker, who held the rank of sergeant, had been employed by the Department for approximately thirteen years and had received favorable job reviews and commendations. Worker had not been disciplined previously, except for one incident in relation to overtime, and that discipline had been rescinded by the Department. Worker presented evidence that he had previously been a labor activist or advocate for better pay and conditions for correctional officers.

{4} On May 9, 2000, Secretary of Corrections Robert J. Perry and Deputy Secretary John Shanks were at the Central New Mexico Correctional Facility (Central) for meetings and conducted an inspection tour of the facility. An associate warden at Central, Warden Langston, testified he personally notified Worker in advance about the tour by Perry and Shanks and told Worker to ensure that things were running smoothly. Langston testified that Worker said something

like, "I will tell him exactly how I feel," or "[w]hat I'm thinking."

{5} Toward the end of the tour, Perry and Shanks entered a security office where Worker and correctional officer Howard Houston were located. Shanks testified that it was his intention, in keeping with his practice, to greet the two officers. From this point forward, testimony describing the interaction between Worker, Perry, and Shanks is conflicting.

{6} We begin with the viewpoint of Perry and Shanks as the version least favorable to Worker. Perry recounted that he greeted Houston, who was polite but seemed nervous, while Shanks approached Worker. Worker refused Shanks's offered handshake. When Perry moved to greet Worker, Worker rose up part way from a seated position behind a desk and forcefully slapped a stack of five to ten coins toward both visitors, which resulted in the coins striking them both on the legs. Perry testified that after the coins struck him, he asked Worker, "What's that all about?" and that Worker replied, "That's for our fucking raises." Shanks also testified that Worker said, "That's for our fucking raises." Perry then asked the others to leave the room so that only he, Shanks, and Worker remained. Again, Perry asked what this was all about and Worker replied, "That's how much you're fucking worth to us." Perry testified that he was defensive and concerned that a physical fight would take place and described Worker as angry. Shanks testified that, but for his position and self control, he could have responded physically to this provocation. Perry told Worker that he should consider looking for another job if he behaved so unprofessionally, to which Worker replied with something similar to, "I like my job," and "I don't care who you are." At this point, Perry attempted to describe his efforts to obtain pay raises for officers, to which Worker replied, "I don't believe you." Shanks told Worker that his behavior was a disgrace to the Department, to which Worker replied, "You're a disgrace, too." At this point, the interaction ended when either Shanks or Perry opened the office door, allowing re-entry of those waiting just outside. Perry told Langston to place

Worker on administrative leave. Perry testified that inmates were nearby during the confrontation.

{7} Worker's version of these events is strikingly different. Worker denied slapping or striking the coins at Perry and Shanks but claimed that he only "nudged or dropped" them off the desk, a gesture he admitted was probably "not prudent." He denied any advance planning, claiming it was a "spur of the moment" act. He said he had only been planning to ask Perry about officers being allowed to observe National Correctional Officers Day. He also denied cursing at Perry, saying that he had said, "thanks for our pay raise," in a normal, conversational tone, remaining calm and using no profanity. Worker testified that it was only Perry and Shanks who were angry and hostile, that Perry raised his voice and Shanks was "trying to crowd me." He could not understand why they were so upset. Worker had previously claimed in a statement provided to a department investigator that he had dropped the coins for "some reason, still unknown to me," but on cross examination he stated that, upon reflection, "it became clear" to him that he was "indignant" at the time over the lack of a pay raise. Worker testified that at the time of the incident, he was a supervisor in the minimum restrict unit portion of Central.

{8} Others who were in the security office at the time also testified. Houston, who had been seated nearby, testified that Worker had dropped the coins, not slapped them, and had not cursed, but only sarcastically said, "Thanks for my raise." Houston said that Perry and Shanks went "into an uproar about the whole deal" and that it was Perry who raised his voice and was angry. On cross examination, Houston admitted that Worker was a "good guy," a work friend, and his supervisor, and that Houston admired what Worker had done. Houston also admitted to being unhappy working at the Department and was contemplating resigning. Captain Bill Marez testified that he was standing behind Perry and Shanks when he heard the coins strike the floor. He heard Perry say something like, "What was that for?" and heard Worker, who he described as angry with a red face, say in a raised voice,

"That's what I think of your raise," but did not recall any profanity. Finally, Langston testified that he saw Worker swipe the coins at Perry and Shanks and saw the coins strike them in the legs. Langston thought that he heard Worker say, "That's what I think of your fucking raise," although he had excluded the profanity from his prior descriptions and was "not one hundred percent" sure that Worker had used profanity.

{9} The warden at Central, Ron Lytle, testified that he asked Worker what had happened immediately after the incident. Both Lytle and Langston testified that Worker replied, "I did what I had to do and now you have to do what you have to do." Worker denied saying this, but claimed instead that he "didn't understand why they were so upset" and "didn't know what was going on" so he "had nothing to say." After the incident, Langston took Worker's official identification, and senior staff, including Perry and Shanks, escorted Worker from the facility. Lytle placed Worker on administrative leave. After receiving statements from witnesses and providing Worker with an oral response hearing, Lytle issued a notice of final action dismissing Worker from the Department.

## II. PROCEDURAL POSTURE

{10} Worker appealed his termination to the Personnel Board. The Personnel Board's ALJ conducted a two-day hearing, at which Worker testified and was represented by counsel. The parties stipulated that the Personnel Board had jurisdiction over Worker's appeal and thus agree that Worker was a classified state employee subject to the Personnel Act. *See* NMSA 1978, §§ 10–9–1 to –25 (1961, as amended through 1999). The ALJ made findings of fact that Worker had forcefully struck the coins at Perry and Shanks and had cursed at them. The ALJ also made conclusions of law that Worker's actions violated the Department's code of ethics, that dismissal of Worker was justified without the need for progressive discipline, and that Worker's speech was not protected by the First Amendment. Worker filed exceptions to the ALJ's recommended decision with the Personnel Board. The Personnel Board, however, adopted the ALJ's findings and conclusions and affirmed Worker's dismissal. Worker appealed to the district court under Section 10–9–18(G) (allowing appeals of Board decisions), NMSA 1978, 39–3–1.1(C) (1999) (permitting judicial review of final administrative agency decisions), and Rule 1–074 NMRA (governing administrative appeals to the district court). The district court affirmed Worker's termination.

{11} Worker timely sought a writ of certiorari from this Court, which we granted. *See* § 39–3–1.1(E) (permitting a party to petition the Court of Appeals for a writ of certiorari to review the district court's decision in an administrative appeal); Rule 12–505(B) NMRA (same).

## III. DISCUSSION

{12} We first set out the standard of review applicable to appeals of administrative decisions. We then address Worker's contention that progressive discipline was mandatory in this case as a matter of law. Finally, we address Worker's claim as to lack of notice, and his connected arguments on disparate discipline, the paramilitary structure of the Department, and civil battery.

### A. Standard of Review

{13} In reviewing a decision of the Personnel Board, we apply a whole-record standard of review. *Martinez v. N.M. State Eng'r Office*, 2000–NMCA–074, ¶ 31, 129 N.M. 413, 9 P.3d 657. "Like the district court, we independently review the entire record of the administrative hearing to determine whether the Board's decision was arbitrary and capricious, not supported by substantial evidence, or otherwise not in accordance with law." *Id.* An administrative ruling is arbitrary and capricious if it is "unreasonable or without a rational basis, when viewed in light of the whole record," and we must avoid substituting our own judgment for that of the agency. *Archuleta v. Santa Fe Police Dep't, ex rel., City of Santa Fe*, 2005–NMSC–006, ¶ 17, 137 N.M. 161, 108 P.3d 1019. Whether the Board's actions were contrary to law is a question that we review de novo. *Id.* ¶ 18. The burden is on the party challenging the agency decision to

demonstrate grounds for reversal. *Regents of Univ. of N.M.*, 1998–NMSC–020, ¶ 17, 125 N.M. 401, 962 P.2d 1236.

## B. Just Cause And Progressive Discipline

{14} Worker contends that progressive discipline was required in his case. We begin by reviewing the concept of just cause for discipline and then discuss progressive discipline.

{15} Employees subject to the Personnel Act who have completed a probationary period may only be disciplined for just cause. 1 NMAC 7.11.10(A) (2002). Our review necessarily includes an evaluation of whether just cause existed for discipline, including termination, because the Board "must decide whether agency action was based on just cause" and we are reviewing the Board's action. *Gallegos v. N.M. State Corrs. Dep't*, 115 N.M. 797, 802, 858 P.2d 1276, 1281 (Ct.App.1992) (internal quotation marks and citation omitted). Just cause to terminate an employee covered by the Personnel Act requires that the Board determine both that the employee engaged in misconduct and that the discipline was appropriate and reasonable in light of the misconduct. *Martinez*, 2000–NMCA–074, ¶ 30, 129 N.M. 413, 9 P.3d 657. Just cause to terminate exists "when an employee engages in behavior inconsistent with the employee's position and can include, among other things, incompetency, misconduct, negligence, insubordination, or continuous unsatisfactory performance." *Id.* ¶ 32; *see also* 1 NMAC 7.11.10(B) (defining just cause similarly). The question of whether behavior "constituted misconduct so as to provide 'just cause' for the discipline of a state employee is a question of fact to be determined from all the attendant circumstances in each case." *Romero v. Employment Sec. Dep't*, 102 N.M. 71, 74, 691 P.2d 72, 75 (Ct.App.1984). We review an agency's findings by examining the entire record, but we must affirm a decision if it is supported by substantial evidence. *Regents of Univ. of N.M.*, 1998–NMSC–020, ¶ 17, 125 N.M. 401, 962 P.2d 1236.

{16} The ALJ found that progressive discipline was not required for Worker's "egregious action" that provided just cause for termination. We agree. The findings were supported by substantial evidence, and they support the determination that just cause existed to terminate Worker without first employing lesser forms of discipline.

{17} The evidence as to Worker's behavior in the security office was conflicting. Worker's testimony was self-serving overall, and the record fairly supports an inference that Worker was untruthful. *See Gallegos*, 115 N.M. at 801, 858 P.2d at 1280 (concluding that no substantial evidence supported a finding of misconduct where no evidence existed to support an inference that the employee was untruthful). Houston's testimony supporting Worker was effectively impeached. Perry and Shanks both told identical stories and were in the best position to see and hear Worker. Langston and Marez, who were nearby, generally supported the version recounted by Perry and Shanks, but were either unsure of or could not recall the use of profanity. Langston's testimony supported the notion that Worker was aware of the tour and was planning some type of confrontation. On the other hand, Worker contended that he had been a labor activist and advocate for better pay and hours for correctional officers, contending that this could motivate retaliation by the Department against him. In this case, however, such evidence cuts both ways—not only is it a potential motivation for the Department to fire him, but his pro-labor activities also provide a plausible motive for the very misconduct of which Worker was accused. Based upon the entire record, there was substantial evidence for the fact finder in this case to have found that Worker cursed at Perry and Shanks and deliberately slapped or struck the coins, causing them to strike Perry and Shanks.

{18} Having determined that the findings are properly supported, we further conclude that the ALJ correctly applied the law to the facts in deciding that just cause existed for termination without the need for progressive discipline. Both the Personnel Board Rules and the Department's own rules promote the concept of progressive discipline, which means that increasing levels of discipline should be used in an effort to retain the

employee and to correct deficient performance or behavior. *See* 1 NMAC 7.11.8(B) (2001) (stating that progressive discipline "shall be used whenever appropriate"). Progressive discipline, however, need not be used in all cases. *Id.* (stating that "[t]here are instances when a disciplinary action, including dismissal, is appropriate without having imposed a less severe form of discipline"). The Department's own rules state that "some misconduct is so severe as to not warrant progressive discipline and immediate dismissal is the only appropriate action."

{19} Several New Mexico cases have evaluated progressive discipline and its relation to the concept of just cause for discipline. In accord with the Board rules, our cases have "recognized that progressive discipline is not required before termination when the conduct for which an employee is terminated constitutes just cause to terminate." *Martinez*, 2000–NMCA–074, ¶ 42, 129 N.M. 413, 9 P.3d 657. The question then becomes precisely what conduct provides just cause to terminate, which again requires a case-by-case evaluation. *Romero*, 102 N.M. at 74, 691 P.2d at 75.

{20} Other cases provide guidance in this evaluation. In the context of a denial of unemployment insurance benefits, our Supreme Court has focused on the importance of willful misconduct contrasted with simply poor performance, concluding that an employer had to show compliance with progressive discipline policies where only unsatisfactory job performance was at issue and there was no substantial evidence to support a finding of willful misconduct. *Chicharello v. Employment Sec. Div.*, 1996–NMSC–077, ¶ 4, 122 N.M. 635, 930 P.2d 170. The case of *New Mexico Regulation & Licensing Department v. Lujan*, 1999–NMCA–059, 127 N.M. 233, 979 P.2d 744, teaches that socially inappropriate conduct may not rise to the level of just cause for termination, particularly where there is a culture of misbehavior. There, a worker had engaged in a pattern of "foul language, sexually charged misconduct, and outbursts of anger." *Id.* ¶ 2. The hearing officer in that case found the conduct was demeaning and disrespectful, but found no just cause for dismissal in light of "other

conduct occurring at the office, all of it attributable to lack of effective management." *Id.* ¶¶ 4, 18, 19 (internal quotation marks omitted). We agreed, based upon the whole record, that there was no just cause for dismissal and that progressive discipline was required. *Id.* ¶ 21. *Martinez*, on the other hand, instructs that hostile or threatening behavior clearly provides just cause for termination. In *Martinez*, a worker failed to control his mental illness and became erratic and threatening at work, including threatening the life of a supervisor over the telephone. 2000–NMCA–074, ¶¶ 9–15, 129 N.M. 413, 9 P.3d 657. There, we noted that the employee was dismissed for "insubordination, misconduct, and threats of physical violence against his supervisor, all of which clearly fall within the category of conduct constituting just cause for dismissal." *Id.* ¶ 42. We found there that the conduct in question was "the type of serious 'misconduct' which does not have to be tolerated by an employer and which justifies immediate dismissal." *Id.* We have held that "the term 'misconduct' as contemplated by the rule is not limited to circumstances of intentional wrongdoing, but also embraces an employee's disregard of proper behavior which an employer has a right to expect of an employee." *Romero*, 102 N.M. at 74, 691 P.2d at 75. Our cases have also expressly noted that supervisory staff clearly affect the efficiency of the agency and serve as examples for subordinates. *Id.* Finally, our Supreme Court has recently stated that we must be properly deferential to the internal disciplinary practices of an agency. *Archuleta*, 2005–NMSC–006, ¶ 28, 137 N.M. 161, 108 P.3d 1019 (stating that "[t]he propriety of a disciplinary measure meted out by [an agency] is a matter of internal administration with which a court should not interfere absent a clear abuse of authority" (internal quotation marks and citation omitted)).

{21} Based upon the foregoing, it is clear that whether progressive discipline was required turns on whether there was just cause for termination. We think just cause for termination was properly found for three reasons. First, unlike the circumstances in *Lujan*, here the hearing officer found just cause for dismissal and also did not find any

culture of misbehavior or mismanagement mitigating Worker's actions. 1999–NMCA–059, ¶ 18, 127 N.M. 233, 979 P.2d 744. The Personnel Board and the district court each affirmed this conclusion; while we independently determine whether just cause existed, we find it noteworthy that the ALJ, the Personnel Board, and district court all concluded that just cause for termination existed. We agree and, based upon the standard articulated in *Archuleta,* see no clear abuse of authority. Second, we see this case as more akin to *Martinez,* in which aggressive, threatening, and hostile behavior "clearly fall[s] within the category of conduct constituting just cause for dismissal." 2000–NMCA–074, ¶ 42, 129 N.M. 413, 9 P.3d 657. Several factors inform this conclusion: (1) the confrontation was planned and intentional, (2) while Worker was on duty, (3) as a supervisor, (4) committing a civil battery on his superiors, (5) using hostile and foul language, and (6) all of which come close to causing a physical fight. We think these combine to overcome Worker's long positive record with the Department. Third, unlike *Chicharello,* here there is substantial evidence to support a finding of misconduct, and the Department was not attempting to correct merely unsatisfactory job performance. 1996–NMSC–077, ¶ 4, 122 N.M. 635, 930 P.2d 170. Worker engaged in misconduct, and the Department's response to that conduct was neither unreasonable, *Martinez,* 2000–NMCA–074, ¶ 30, 129 N.M. 413, 9 P.3d 657, nor a clear abuse of authority, *Archuleta,* 2005–NMSC–006, ¶ 28, 137 N.M. 161, 108 P.3d 1019. Because just cause existed to terminate Worker, progressive discipline was not necessary. *Martinez,* 2000–NMCA–074, ¶ 36, 129 N.M. 413, 9 P.3d 657 (stating that "[o]nce it is determined that just cause exists to terminate, termination is appropriate under the Board Rules"). In sum, we find no clear abuse of authority, no contravention of our law, and no capriciousness in the Personnel Board's determination that just cause existed to discipline Worker and to terminate him without imposing progressive discipline.

## C. Lack of Notice and Associated Arguments

{22} Initially in his appeal to the Personnel Board, Worker claimed he was not on notice that his actions could result in termination. This reference to notice was also contained in the list of Worker's contested issues in the joint stipulated pre-hearing order. The Department contends that such an argument was not preserved for our review and also lacks merit. After thoroughly reviewing the record, we agree with the Department on these points. Worker recites lack of notice in the heading of his first issue on appeal to this Court, but cites no authority in reference to any notice requirement. Worker is not claiming a procedural right to notice, such as notice of the hearing or the allegations against him. Instead, we discern that the substance of his argument is aimed at making the following points: (1) that he was subjected to disparate discipline, (2) that the ALJ improperly relied on the purportedly paramilitary nature of the Department to find just cause for termination, and (3) that striking Perry and Shanks with the coins was not "meaningfully" a civil battery. We reject each contention in turn after discussing Worker's attempt to argue lack of notice.

{23} We generally will not review a matter not passed upon by the trial court, which in this case was either the ALJ sitting as the trier of fact, or the Personnel Board as the ultimate decision maker. Rule 12–216(A) NMRA. While the formal rules of procedure need not all be followed in administrative proceedings, we do require preservation of issues raised on appeal from an administrative decision. *Garza v. State Taxation & Revenue Dep't,* 2004–NMCA–061, ¶¶ 7, 8, 135 N.M. 673, 92 P.3d 685 (evaluating whether an issue had been preserved in an administrative hearing). Worker made no notice argument before the ALJ or in his statement of exceptions to the Personnel Board. Indeed, in his opening statement, Worker stated that the case involved only "three of the seven" issues raised in the joint stipulated pre-hearing order. Notice was not one of the three arguments. The only argument in the hearing regarding notice was from the Department, not Worker. Worker may not preserve an argument raised by his opponent. *Woolwine v. Furr's, Inc.,* 106 N.M. 492, 496, 745 P.2d 717, 721 (Ct.App.

1987) (stating that "[t]o preserve an issue for review on appeal, it must appear *that appellant* fairly invoked a ruling of the trial court on the same grounds argued in the appellate court" (emphasis added)). In fact, Worker expressly conceded that if the allegations were true, perhaps even severe discipline would be justified and at the hearing stated that notice, at least of the contents of the code of ethics, was "not an issue."

{24} We decline to review an issue when Worker did not invoke a ruling of the ALJ thereon. Moreover, even if this argument were preserved for our review, Worker provides no authority for his argument that he lacked notice of the border between acceptable and unacceptable behavior. This Court will not consider an argument that lacks citation to any legal authority in support of that argument. *Santa Fe Exploration Co. v. Oil Conservation Comm'n,* 114 N.M. 103, 108, 835 P.2d 819, 824 (1992).

{25} Unlike his notice argument, however, Worker did seek to show that he was subjected to disparate discipline. In attempting to demonstrate this, he elicited the following testimony. First, Worker offered evidence that a correctional officer at Central had been coached (but not disciplined) for refusing to shake Perry's hand. Second, he obtained testimony that another officer had asked Perry, off-duty and in a noisy bar, an arguably provocative question and had inadvertently dropped a pitcher of beer near Perry. This did not result in any discipline and Perry denied that any beer was thrown on him. Finally, in response to testimony alluding to a purportedly similar incident, the Department introduced a letter showing that a correctional officer had been reprimanded for calling a higher ranking officer an "idiot" in the presence of others and leaving his post before the end of the shift. The ALJ found no disparate discipline, and there is substantial evidence supporting this finding.

{26} We see none of these actions as substantially similar to Worker's because none involved the combination of hostile words and acts tending to provoke a physical altercation by an on-duty supervisor. As we have discussed, the findings provided just cause to dismiss Worker. Thus, Worker's reliance on disparate discipline cases is misplaced. *See In re Termination of Kibbe,* 2000–NMSC–006, ¶ 19, 128 N.M. 629, 996 P.2d 419 (holding that termination of a worker was arbitrary where there was a "drastic difference" in treatment of a worker compared to another for "substantially similar" conduct in the context of public school employees). And even where other officers are similarly situated, they may be disciplined differently based upon the severity of the conduct, the circumstances, and the consequences of the conduct. *Archuleta,* 2005–NMSC–006, ¶¶ 24, 32, 137 N.M. 161, 108 P.3d 1019 (explaining that "[e]ven similarly situated employees may be disciplined differently depending on the severity of the conduct" and summarizing New Mexico disparate discipline cases).

{27} Next, we consider Worker's concern about the ALJ's reliance on the paramilitary nature of the Department. Warden Lytle, who had served in the Navy, described the paramilitary nature of the Department, including its adherence to a chain of command structure. He spoke at length about the need for obedience and respect in a prison's inherently dangerous environment and described the Department as "very similar" to the military. Lytle testified that it was his decision to dismiss Worker and his decision was based upon his fear that if he did not use the highest discipline then more similar incidents would occur, leading to a breakdown in staff cohesion, respect by inmates, and the ultimate safety and order within the facility. The ALJ found that the Department is a paramilitary organization and relied on this finding in its conclusion that just cause existed to terminate Worker. This finding was adopted by the Personnel Board.

{28} We consider this finding superfluous and affirm without passing on this paramilitary argument for two reasons. First, we may affirm the ruling from below on a different ground, as long as doing so is not unfair to the appellant and there is substantial evidence supporting the ground we rely on. *Meiboom v. Watson,* 2000–NMSC–004, ¶ 20, 128 N.M. 536, 994 P.2d 1154. We

have already concluded that substantial evidence supports a finding that just cause for termination existed. We think the finding that the Department is paramilitary in style is of no consequence to an ultimate determination of just cause for discipline. Worker's arguments at the hearing disputed both the factual basis for discipline and the existence of just cause, so we see no unfairness to Worker in holding that just cause existed in a more generalized sense. Second, a finding that is irrelevant or not necessary to support the judgment may be disregarded. *Martinez*, 2000–NMCA–074, ¶ 43, 129 N.M. 413, 9 P.3d 657. Again, we conclude that the paramilitary basis was not essential to the conclusion that just cause existed. We recognize that the ALJ may have concluded that the prison environment demanded a higher degree of courtesy, respect, and obedience from Worker than would more traditional types of state work. However, we need not pass upon this question of paramilitary structure because we conclude that Worker's behavior would meet the standard of just cause for termination in any state organization. We express no opinion about whether the Department is or is not paramilitary in nature and the impact this may have on its disciplinary practice.

{29} Finally, we are not persuaded by Worker's argument that he did not commit battery. Worker elicited testimony that no injury or harm was likely from the coins being launched at Perry and Shanks. Worker now argues that he did not "meaningfully" commit a civil battery. He is mistaken. It is black-letter law that causing an offensive touching, even indirectly to another's clothing and not resulting in injury, is the tort of battery. *State v. Ortega*, 113 N.M. 437, 440–41, 827 P.2d 152, 155–56 (Ct. App.1992) (describing tortious battery as including causing indirect contact with a person's clothing and applying these concepts to criminal battery). Worker's citation to criminal battery cases notwithstanding, his actions constituted a tort, and it was proper for the ALJ to have so found and used in its consideration of Worker's conduct.

## IV. CONCLUSION

{30} The district court's decision affirming Worker's termination from the Department is affirmed.

{31} **IT IS SO ORDERED.**

WE CONCUR: A. JOSEPH ALARID and IRA ROBINSON, Judges.